# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| CARLA CALOBRISI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-cv-00996-AJT-TRJ |
| | ) |
| BOOZ ALLEN HAMILTON INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## DEFENDANT BOOZ ALLEN HAMILTON INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Stephen W. Robinson (Va. Bar No. 15337)
Sarah A. Belger (Va. Bar No. 67947)
Melissa L. Taylormoore (Va. Bar No. 75506)
*Counsel for Defendant Booz Allen Hamilton Inc.*
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
Tysons Corner, Virginia  22102
Telephone: (703) 712-5469
Facsimile: (703) 712-5258
srobinson@mcguirewoods.com
sbelger@mcguirewoods.com
mtaylormoore@mcguirewoods.com

Defendant Booz Allen Hamilton Inc. ("Booz Allen" or "the firm"), by counsel, pursuant to Federal Rule 56, submits this Memorandum in support of its Motion for Summary Judgment:

## I.     INTRODUCTION

Plaintiff Carla Calobrisi ("Plaintiff") voluntarily resigned from as an in-house attorney with Booz Allen effective October 31, 2011, where she was making approximately $260,000 a year, not including a $50,000 annual bonus.  Plaintiff resigned at a time of her own choosing after spending nearly four months helping to recruit, interview and hire her replacement. Plaintiff now contends that this voluntary decision was the product of discrimination and retaliation notwithstanding the fact that the Record is devoid of any evidence that Plaintiff's age or gender played any role in any employment decision throughout her entire tenure.

As fully set forth below, toward the end of 2010 Booz Allen was preparing to reenter the commercial and international markets after a three-year hiatus stemming from a non-compete agreement.  As a result, the Law Department, like all other departments within the firm, was making strategic decisions with respect to personnel to ensure that the firm was best positioned to capture work in these new areas.  While Plaintiff's then-supervisor, William Meyers, had hoped that this time of transition would be her "time to shine," the General Counsel, CG Appleby, concluded that Plaintiff's area of responsibility overseeing the firm's Real Estate, Commercial and International practice areas was too broad for a single attorney to lead after the non-compete expired.  As a result, Mr. Appleby – the same person who hired and promoted Plaintiff throughout her tenure at Booz Allen – appointed two other <u>female attorneys</u> in his Law Department, Debra Storms (age 46) and Karen Tinsky (age 36), to oversee the firm's Commercial and International practice areas, leaving Plaintiff as the lead for the firm's Real

2

Estate practice group.  Mr. Appleby made this decision not because of Plaintiff's gender or age, but because Plaintiff's core skill set was real estate, while Ms. Storms and Ms. Tinsky were commercial and government contract attorneys, respectively, who had deep experience in counseling clients on substantive legal issues in commercial and international government contracting.   Accordingly, based upon these and the other undisputed material facts set forth below, summary judgment is proper on all counts.

## II.   PROCEDURAL HISTORY

Plaintiff filed her Complaint on May 31, 2013 in the D.C. Superior Court alleging gender and age discrimination and retaliation in violation of the D.C. Human Rights Act ("DCHRA") (Counts I, III, V), Title VII of the Civil Rights Act, (Counts II, VI), and the Age Discrimination in Employment Act ("ADEA") (Counts IV, VII).  Booz Allen removed the case to the D.C. District Court on June 24, 2013.  On July 1, 2013, Booz Allen moved to dismiss Plaintiff's DCHRA claims, and to transfer Plaintiff's remaining ADEA claims to the Eastern District of Virginia.  The D.C. District Court dismissed Plaintiff's DCHRA claims with prejudice and transferred the remaining claims.  The parties exchanged written discovery, Plaintiff took 10 depositions and Booz Allen took 6 depositions.  As the record is devoid of any evidence to support Plaintiff's claims of discrimination and retaliation, and because discovery revealed no disputed issue of material fact, Booz Allen moves for summary judgment on Plaintiff's discrimination and retaliation claims and seeks dismissal of the Complaint with prejudice.

### III.     STATEMENT OF UNDISPUTED FACTS

#### Plaintiff's Employment History

1.      Booz Allen is a professional services consulting firm that provides services to government and commercial clients.  The Law Department is Booz Allen's in-house legal team which provides legal counsel to Booz Allen in all areas relating to the firm's operations, including risk management, ethics and compliance, government and commercial contracts, employment law, international law, intellectual property, investigations, securities law.  The Law Department is responsible for supporting policy formulation, responding to inquiries from investigative agencies, managing litigation, and enhancing compliance with the firm's Code of Business Ethics and Conduct.  (Ex. 1, Third Meyers Decl., ¶ 5.)

2.      In approximately April of 2000, Booz Allen's part-time attorney, Lisa Franzen, who handled all of its real-estate matters, including corporate registrations, leases and associated powers of attorney, left Booz Allen.  (Id. ¶ 6.)  Plaintiff was hired on April 10, 2000 as a Senior Associate and Associate General Counsel to replace Ms. Franzen.  (Id.)  CG Appleby was the General Counsel at the time of Plaintiff's hire and was the ultimate decision maker who approved her hire.  (Compl. ¶¶ 12-13; Ex. 2, Pl.'s Dep. Tr. 154:9-155:1.)  In 2004, Mr. Appleby promoted Plaintiff to Principal.  (Id., 190:12-16.)  By 2011, her salary had risen to $263,272, and she was one of the highest paid Principals in the entire firm.  (Ex. 1, Third Meyers Decl., ¶ 7.)

#### Booz Allen's Business Model

3.      At the time of Plaintiff's hire in 2000, Booz Allen had two sides to its business: federal government and commercial. (Ex. 1, Third Meyers Decl., ¶ 8.)  In 2008, Booz Allen spun off its commercial and international business lines as part of a transaction with the Carlyle

Group.  (<u>Id.</u>)  As a part of this transaction, Booz Allen entered into a non-compete agreement with Booz & Company (the entity that acquired Booz Allen's commercial and international business portfolio), which prohibited Booz Allen from doing any business in the commercial markets and most international areas for a period of three years until July 30, 2011.  (<u>Id.</u>)

4.     In 2009, Mr. Appleby named Plaintiff as the lead for the Real Estate, Commercial and International practice group.  (Ex. 3, Jan. 31, 2014 Appleby Dep. Tr. 37:18-38:3.)  In this role, Plaintiff was primarily responsible for the firm's real estate work, including that work in foreign countries.  (<u>Id.</u>, 42:8-18.)  Plaintiff also served as the head of the firm's limited remaining work in the commercial and international areas.  (Ex. 4, Meyers Dep. Tr. 40:6-43:5.)  In this capacity, she advised Booz Allen's internal clients on any real estate issues in conjunction with the remaining international contracts, and on Booz Allen's routine business transactions with its own vendors.  (<u>Id.</u>)  Plaintiff's role, however, did not involve providing regular advice and counsel to the firm's business leaders on the core government contracting issues that were associated with the remaining commercial or international business.  (Ex. 2, Pl. Dep. Tr. 36:17-21.)

**The Law Department Prepared to Reenter the Commercial and International Markets**

5.     Toward the end of 2010, Mr. Appleby, as General Counsel, began to strategize about how best to structure the Law Department to support the firm's reentry into the commercial and international markets upon the July 2011 expiration of the non-compete with Booz & Company. (Ex. 3, Jan. 31, 2014 Appleby Dep. Tr. 9:14-10:20.)  Based upon his knowledge of the firm's anticipated surge of work associated with the reentry into the commercial and international markets, Mr. Appleby decided that it would no longer be feasible for one attorney to oversee the three practice areas of real estate, commercial and international.  (Ex. 5 30(b)(6) Dep. Tr. 26:20-

16; Ex. 3, Jan. 31, 2014 Appleby Dep. Tr. 11:17-15:20; Ex. 27, Dec. 19, 2014 Appleby Dep. Tr. 27:8-28:17, 63:19-34:3.)   As a result, Mr. Appleby decided to divide the Real Estate, International and Commercial practice group into three separate areas and have a single attorney oversee each of the new practice groups to allow the Law Department to better serve the needs of its internal clients.  (Ex. 3, Jan. 31, 2014 Appleby Dep. Tr. 11:17-15:20, 19:12-18, 21:1-4, 38:13-22, 42:1-18; Ex. 27, Dec. 19, 2014 Appleby Dep. Tr. 27:8-28:1, 63:19-64:3.)

6.    Mr. Appleby (age 65) decided Plaintiff (female, age 55) would remain the Real Estate practice lead, which was viewed as her primary strength.  (Ex. 27, Dec. 19, 2014 Appleby Dep. Tr. 65:5-66:7.)  He then decided that Debra Storms (female, age 46) and Karen Tinsky (female, age 36) would lead the firm's Commercial and International practices. (Id., 28:2-17; 65:5-14.)[1]

7.    Before joining Booz Allen's Law Department, Ms. Storms was responsible for the commercial legal work for a U.S. subsidiary of a German company in her role as that company's General Counsel.  (Id., 31:17-32:2; Ex. 5, 30(b)(6) Dep. Tr. 74:7-20).  In addition, during her nine-year tenure at Booz Allen, Ms. Storms drove the firm's intellectual property work, including acquiring patents and copyrights, and led any litigation stemming from those efforts.  (Ex. 4, Meyers Dep. Tr. 166:5-19.)  She was also the lead attorney who handled any export matters for the firm.  (Ex. 5, 30(b)(6) Dep. Tr. 73:3-21; Ex. 6, Storms Performance Assessment.)

---

[1]    Mr. Appleby did not consult with anyone outside the Law Department in making this decision, including the firm's Leadership Team or other Senior Partners, such as Ralph Shrader, Sam Strickland or Horacio Rozanski.  (Ex. 3, Jan. 31, 2014 Appleby Dep. Tr., 57:8-58:1, 66:14-21; Ex. 2, Pl.'s Dep. Tr. 60:21-61:13.)  Similarly, Mr. Osborne, Mr. Meyers and Mr. Manya had no conversations with the Leadership Team, including Dr. Shrader, Mr. Strickland or Mr. Rozanski, concerning Mr. Appleby's decision.  (Ex. 4, Meyers Dep. Tr. 154:1-15.)

8.     Ms. Tinsky's expertise was in government contracts.   During the three-year non-compete with Booz & Company, she performed the majority of the substantive legal work in the limited areas of the international markets that Booz Allen could operate.  (Ex. 7, Manya Dep. Tr. 80:9-81:12.)   Specifically, and unlike Plaintiff who merely did leases and registrations, Ms. Tinsky counseled all internal clients on the firm's engagements with USAID, Millennium Challenge Corporation, State Department and the foreign military sales work.  (Id., 97:1-12.) Moreover, like Ms. Storms, Ms. Tinsky provided legal support to internal clients regarding the Foreign Corrupt Practices Act and Foreign Ownership, Control or Influence.  (Id., 80:9-81:12; Ex. 8, Tinsky Performance Assessment.)

9.     By contrast, Plaintiff was not a government contracts attorney.  (Ex. 2, Pl's Dep. Tr. 36:17-19.)   Indeed, Plaintiff had not performed the volume or complexity of work in the commercial and international markets that Mr. Appleby anticipated that the firm's internal clients would need upon reentry. (Ex. 27, Dec. 19, 2014 Appleby Dep. Tr. 51:1-21.)   Plaintiff's involvement in international or commercial matters was episodic and at the periphery of the firm's business, usually limited to operational matters such as registering offices in foreign countries, negotiating leases for office space and executing powers of attorney.  (Ex. 7, Manya Dep. Tr. 95:18-96:7, 97:1-12, 111:10-22.)   Thus, Mr. Appleby believed Ms. Storms and Ms. Tinsky had more experience providing legal counsel on the commercial and international matters that the firm would face.  (Ex. 5, 30(b)(6) Dep. Tr. 72:5-74:22.)  Mr. Appleby concluded that the firm would not be best served by Plaintiff being the lead of the Commercial or International practice groups after the reentry.  (Ex. 27, Dec. 19, 2014 Appleby Dep. Tr. 49:17-51:12.)

10.     In conjunction with this change, based upon his understanding of the demands and responsibilities that would be required for the Real Estate practice lead position, and the types of expectations and benchmarks required for Principal level positions across the firm, Mr. Appleby decided that the Real Estate practice lead position was more appropriately scoped as a Senior Associate position. (Ex. 5, 30(b)(6) Dep. Tr. 36:2-18.)  Indeed, at the time this decision was made, the parallel positions for both the Commercial and International practice groups leads were also Senior Associate positions.  (Ex. 1, Third Meyers Decl., ¶ 11.)

11.     On January 20, 2011, Mr. Appleby called a meeting in the firm's McLean, Virginia headquarters, where the Law Department is located, and met with Robert Osborne, the firm's incoming General Counsel effective July 2011, and the Deputy General Counsels – William Meyers (Plaintiff's supervisor) and Douglas Manya.  (Ex. 3, Jan. 31, 2014 Appleby Dep. Tr. 16:21-18:13.)  At this meeting, Mr. Appleby outlined his decision regarding the new structure for the Law Department.    After discussing Mr. Appleby's strategy and thinking behind his reasoning, Messrs. Osborne, Meyers and Manya supported the decision. (Id.)

12.     Mr. Osborne supported the decision because he had observed several deficits in Plaintiff's knowledge regarding critical contracting legal principals.  During 2010, Plaintiff, on repeated occasions, had failed to negotiate basic contractual terms that would have protected the firm from liability and that Mr. Osborne reasonably expected to have known about Plaintiff given her level at the firm.  (Ex. 9, Osborne Dep. Tr. 50:12-59:5.)  For example, not only had Plaintiff included a personal guarantee in a contract that she presented to Mr. Osborne to sign, when negotiating a contract for cyber-security services which posed significant risk to the firm, Plaintiff did not understand that she could negotiate different terms than the boilerplate liability

provisions contained in the master services agreement.  (Id.)  Accordingly, Mr. Osborne did not believe Plaintiff was best poised to lead either the Commercial or International practice group as she was not a subject matter expert in either area.  (Id., 88:9-89:16.)

13.     On January 26, 2011, Mr. Appleby, along with Messrs. Osborne and Meyers, met with Plaintiff to discuss the changes to her position.  (Ex. 5, 30(b)(6) Dep. Tr. 28:18-29:5.) Together they told Plaintiff of the Law Department's restructuring, and told her that her position had been re-scoped.  (Ex. 2, Pl.'s Dep. Tr. 200:3-201:8.)  Plaintiff was notified that the position change would not go into effect until April 1st (the beginning of Booz Allen's next fiscal year), that she would remain eligible for a Principal level bonus, and that there would be no change in her salary as a result of the restructuring.  (Id., 21:22-22:7.)  The firm expressed its desire for Plaintiff to stay with the Law Department at this meeting, throughout her remaining tenure, and even afterward.  (Id., 292:17-293:13.)  Plaintiff said she would think about it and would get back to them with a decision about whether she wanted to continue on in a Senior Associate role.  (Id. 292:17-293:15; Ex. 10, Talking Points Memorandum.)  The decision to restructure the Law Department and Plaintiff's role within that new structure was finalized by the end of January. (Id.; Ex. 11, Pl.'s Answers to Interrog., at 3, 25 (calling it a "done deal.")

### Plaintiff Continues to Question Her New Role & Receives Her 2011 Annual Assessment

14.     After January 26th, 2011 Plaintiff continued working with her clients on real estate matters. There was some transition as Ms. Tinsky and Ms. Storms stepped into the commercial and international work.  (Ex. 12, Feb. 1, 2011 Emails between C. Calobrisi & W. Meyers.)

15.     While Plaintiff's position change to Senior Associate was not shared with other employees in the Law Department or with her clients, Plaintiff contacted several colleagues and

internal clients to express confusion about the restructuring and why her position had been re-scoped from a Principal to a Senior Associate.  One such individual Plaintiff contacted was Betty Thompson, the firm's Chief Personnel Officer.  Plaintiff told Ms. Thompson that her position had changed from a Principal to a Senior Associate and she was concerned about whether she could continue to participate in the Diverse Women's Mentoring Circle, a Booz Allen-sponsored group designed to help advance the professional growth of its female internal professionals.  (Ex. 2, Pl.'s Dep. Tr. 272:2-274:21; Ex. 13, Thompson Dep. Tr. 29:1-5.)  Plaintiff told Ms. Thompson that she didn't know why the change had been made (Id. 29:6-14) and wondered if it had anything to do with her being a woman (Id. 31:11-32:6).  When Ms. Thompson directly asked Plaintiff if she had any reason to believe that the decision was because of her gender, Plaintiff responded that she didn't know.  (Id. 31:11-32:6.)  Based upon Plaintiff's apparent confusion about why the decision had been made, Ms. Thompson told Plaintiff that if she did not have clarity about why the decision happened she should go back and ask.  (Id. 29:6-14, 55:11-21.)[2]

16.    Consistent with the firm's general practice, Caroline Wilkie, the HR manager who supported the Law Department, drafted a Memorandum for Mr. Meyers to present to Plaintiff outlining the terms of her new position.  (Ex. 5, 30(b)(6) Dep. Tr. 40:13-41:6, 42:1-4.)  The memorandum stated, "I acknowledge that I have read this memo and approve and voluntarily accept the terms and conditions of the aforementioned transfer" because if Plaintiff did not in fact agree to continue on in the new Senior Associate role, she would either need to find another

---

[2]    After the meeting with Plaintiff, Ms. Thompson contacted Sarah St. Clair in the firm's Human Resources department, and Mr. Meyers, in his role as Plaintiff's supervisor, to confirm about the reasoning behind Plaintiff's re-slotting.  (Ex. 13, Thompson Dep. Tr. 30:4-31:1, 51:1-52:9.)  Ms. Thompson was informed that the re-slotting was not performance-based but was instead the result of the Law Department's attempt to better serve the firm as it reenters the commercial and international markets.  (Id., 47:16-49:11.)

Principal position within the Firm or transition out of the Firm. (Id., 43:4-44:19; Ex. 14, Apr. 5 Signed Memo.) On April 5th, Mr. Meyers presented the Memorandum to Plaintiff. (Id.; see also Ex. 25, Third C. Wilkie Decl., ¶¶ 4-10.)

17.     Both before and after the April 5, 2011 meeting, Messrs. Meyers, Appleby, and Osborne reiterated to Plaintiff that she was a valued member of the Law Department and that they each wanted her to stay and succeed in her new role. (Ex. 2, Pl.'s Dep. Tr. 293:4-15; Ex. 15, Apr. 5, 2011 Emails between C. Calobrisi & W. Meyers.)

18.     In an effort to best position Plaintiff moving forward in her new role, Mr. Meyers worked diligently to support Plaintiff in her 2011 assessment. For example, when Mr. Meyers received Plaintiff's self-assessment he noted several places where Plaintiff was making negative comments about Ms. Tinksy. (Ex. 16, Apr. 6, 2011 Emails between W. Meyers & C. Calobrisi.) Mr. Meyers shared his experience with Plaintiff that such comments would most likely not be received as she intended, and in fact, could be viewed by some individuals in the Assessment Review Group as reflecting negatively on Plaintiff. (Ex. 5, 30(b)(6) Dep. Tr. 105:3-106:9.)

19.     Similarly, Mr. Meyers pressed Plaintiff's assessor not to include negative, although accurate, performance feedback in Plaintiff's 2011 assessment. Jennifer Gleich (who had been selected to do Plaintiff's 2011 assessment as she was a peer to Plaintiff) learned from Mr. Osborne, in the course of conducting the assessment, that Plaintiff had failed to remove a personal guarantee in a lease that she had reviewed and presented to Mr. Osborne for signature. (Ex. 17, Gleich Dep. Tr. 73:19-75:4.) In reviewing the lease himself prior to execution, Mr. Osborne found the personal guarantee language and refused to sign it until it was removed. (Ex. 2, Pl.'s Dep. Tr. 103:14-104:5.) Mr. Meyers was concerned that including such feedback in

Plaintiff's assessment could be extremely problematic since Plaintiff was the lead real estate attorney and was already dispirited as a result of the Law Department's restructuring.  (Ex. 17, Gleich Dep. Tr. 72:12-73:16.)   Mr. Meyers preferred that the performance failure be orally presented to Plaintiff during the assessment debrief instead of permanently placed on her personnel record.  (Id., 72:12-73:16, 78:11-79:6.)

20.     Ms. Gleich ultimately declined to "voice track" the information to Plaintiff because she felt that the best way to help Plaintiff was to be direct with her about her performance shortcomings.  (Id.)  Ms. Gleich felt particularly strongly about including the personal guarantee issue since Plaintiff had shared with Ms. Gleich at a lunch earlier in the year that Plaintiff in fact did not always read all of the terms in the leases she reviewed, despite the fact that she was the only lawyer reviewing them.  (Id., 75:5-16.)

21.     Ms. Gleich received feedback during the assessment that Plaintiff needed to focus on the Real Estate practice group with positive energy and enthusiasm.  In the course of conducting interviews with several of Plaintiff's internal clients, they had noted that Plaintiff had repeatedly voiced her unhappiness with the restructuring and having her position slotted as a Senior Associate position and that they did not want her to continue focusing on it.  (Id., 59:20-60:22.)

22.     Notwithstanding, Plaintiff received a "Meets Expectations" rating and a bonus of $52,000.  (Ex. 18, Pl.'s 2011 Assessment; Ex. 1, Third Meyers Decl. ¶ 12.)

23.     On or about May 31, 2011, Ms. Gleich and Mr. Meyers met with Plaintiff to present Plaintiff with the findings from her performance of the last year and to discuss what Plaintiff should focus on for the upcoming year.  (Ex. 17, Gleich Dep. Tr. 36:9-19.)   At that meeting Ms. Gleich walked Plaintiff through the themes identified in the assessment.  (Id.  99:7-100:5.)  After

completing that portion of the discussion, Ms. Gleich began reviewing the development needs for the upcoming year.  (Id., 101:2-7.)  Ms. Gleich shared with Plaintiff the need for her to have energy and enthusiasm for her role moving forward, at which point Plaintiff became upset and again began questioning why the downslotting decision had been made.  (Id., 101:2-102:1.)

24.    At that point in the meeting, Mr. Meyers told Plaintiff the reasons the decision had been made had been previously shared with her, but stated that if she had a concern about why the decision was made that Booz Allen would open an investigation.  (Id., 102:3-7.)  Mr. Meyers reiterated his previous comments that Plaintiff was a valued member of the team and that he hoped she would embrace where she was.  (Id., 104:6-14; 105:5-12.)  The conversation ended with Mr. Meyers again indicating that if Plaintiff wanted, Booz Allen would open an investigation.  (Id., 105:5-12.)   In response, Plaintiff stated she did not want the firm to investigate. (Id., 109:3-11; Ex. 26, June 30, 2011 Memo.)

**Plaintiff Decides to Resign & Assists in Hiring Her Replacement**

25.    Ultimately, in June of 2011, over four months after Plaintiff was notified of the restructuring, Plaintiff informed Mr. Meyers that she was not comfortable in the Senior Associate role and instead, intended to resign from the firm and pursue an executive coaching certification program from Georgetown University.  (Ex. 19, June 1, 2011 Email from W. Meyers to C. Calobrisi.)  Plaintiff asked Mr. Meyers to provide her a letter of recommendation in connection with her application for this program, which he did.  (Ex. 2, Pl.'s Dep. Tr. 174:8-18; see also Ex. 20, Recommendation Letter.)   Mr. Meyers and Plaintiff discussed various options for her transition. She ultimately agreed to stay with the firm until the Law Department had identified

her replacement.  (Ex. 5, 30(b)(6) Dep. Tr. 116:6-117:5.)  The firm offered to cancel its search for her replacement if she would decide to stay with the firm.  (Ex. 26, June 30, 2011 Memo.)

26.    Plaintiff subsequently began notifying peers in the Law Department and internal clients at the firm that she was voluntarily resigning from the firm.  (Ex. 21, June 13, 2011 Email from C. Calobrisi stating "I wanted to let you both know that I am retiring from the firm.  It is all good and I am very happy about my decision.")  In an effort to make sure that Booz Allen framed Plaintiff's departure in a way that Plaintiff desired, Mr. Meyers asked Plaintiff how she was characterizing her departure.  (Ex. 22, June 9, 2011 Emails from W. Meyers to C. Calobrisi.) Plaintiff stated that she was characterizing it as a retirement.  (Id.)  Mr. Meyers offered that the Department would like to host a celebration to recognize her contributions to the firm if she wanted one.  (Ex. 2, Pl.'s Dep. Tr. 24:1-16; Ex. 4, Meyers Dep. Tr. 212:6-22.)

27.    Plaintiff agreed to stay and help hire her replacement.  (Ex. 2, Pl.'s Dep. Tr. 95:17-96:2.)  Between late June 2011 through August 2011 Plaintiff assisted with the interview process for her replacement. (Id., 306:11-307:22.)  Plaintiff voluntarily selected October 31, 2011 as her last date of employment, and admitted at her deposition that she could have stayed longer. (Ex. 2, Pl.'s Dep. Tr. 285:12-286:6.)

28.    The firm hired Kamaal Jones (male, age 31). Mr. Jones began as a Senior Associate on September 9, 2011 with a starting salary of $185,000 ($75,000 less than Plaintiff).  (Ex. 23, K. Jones Offer Letter.)  During the interview process, Plaintiff rejected a candidate for the position who was about the same age as she and others who were older than Mr. Jones before recommending instead that Mr. Meyers offer the position to Mr. Jones.  (Ex. 2, Pl.'s 307:4-22.) Plaintiff felt that Mr. Jones was the most qualified.  (Id. 308: 4-6.)

**Plaintiff's Lack of Evidence of Discrimination and Retaliation**

29.     Plaintiff claims that she was discriminated and retaliated against because of her gender and age.  (Compl. ¶¶ 103-106, 117-120, 126-135.)  Plaintiff's bases for these claims is Mr. Appleby's decision to restructure the Law Department; to have three separate lawyers lead the Real Estate, Commercial and International work; and to rescope her position from a Principal to Senior Associate position. (Ex. 2, Pl.'s Dep. Tr. 39:19-42:12.)

30.     The sole evidence in support of her gender discrimination claim is Mr. Appleby's decision to make Debra Storms (female, age 46) and Karen Tinsky (female, age 36) the leads for the firm's Commercial and International groups.  (Id. 39:19-45:8.)  The sole evidence in support of Plaintiff's age discrimination claims is that: (a) on no more than three occasions(all after the decision to rescope was made and communicated to her), Mr. Osborne and Mr. Meyers allegedly stated that as a part of the Law Department's restructuring they wanted to hire "younger" lawyers (Ex. 2, Pl.'s Dep. Tr. 340:3-19); and (b) Mr. Meyers referenced the idea of "retirement" to Plaintiff when she discussed leaving the firm (id., 20:6-9, 24:1-25:15).

31.     Plaintiff, however, conceded at deposition that:

    a.   Ms. Storms had more experience than she did in dealing with intellectual property and related matters and that it was "easy to understand that [Ms. Storms] would have been the one to who did the lion's share of that work."  (Id. 34:11-20; see also 33:4-16.);

    b.   She had no experience handling anti-boycott  matters (Id., 36:14-16), did not support the firm's USAID work (Id., 49:16-50:9), and in fact conceded that she was not a government contracts lawyer (Id., 36:17-37:7), all of which were core components of the firm's anticipated commercial and international work upon expiration of the non-compete with Booz & Company; and

    c.   She has no knowledge of Ms. Tinsky's experience in international government contract law prior to coming to Booz Allen and admitted that Ms. Tinsky – and not Plaintiff – regularly reviewed federal government contracts for the firm's clients who

were actually engaged in delivering services and solutions to internationally based clients.  (Id., 32:15-3.)

32.    No evidence exists that Mr. Appleby considered Plaintiff's gender or age when deciding how to restructure the Law Department, or that he made any comments referencing Plaintiff's gender or age beyond a statement to Plaintiff prior to 2008 that he was "happy to have [Plaintiff] in the Law Department because of [her] experience."  (Id., 16:8-17:11, 26:7-18.)

33.    Plaintiff also testified that she has no evidence that Messrs. Osborne, Meyers or Manya made any comments about her gender that she considered to be discriminatory.  (Id., 26:16-19, 31:11-18.)  Similarly, there is no evidence that Mr. Appleby (or Mr. Osborne, Mr. Meyers or Mr. Manya) discussed Plaintiff's gender or age during their conversation where Mr. Appleby shared his strategic decision regarding how he was going to redeploy Ms. Storms, Ms. Tinsky and Plaintiff to lead the Commercial, International and Real Estate practice groups.

34.    Indeed, the firm hired Mr. Jones – the attorney who assumed the Real Estate practice lead upon Plaintiff's resignation – at the Senior Associate level, the same level the position was offered to Plaintiff.  (Id., 295:21-296:8.)  Moreover, as of January 20, 2011, 66.67% of the Law Department was over the age of 40 and 29.17% was over the age of 50.  (Ex. 1, Third Meyers Decl. ¶ 13.)  Lastly, the contemporaneous documents undisputedly establish that Mr. Meyers sought Plaintiff's clarification as to how she wanted to characterize her departure and Plaintiff, not Mr. Meyers, indicated that she was telling others that she was retiring.  (Ex. 22.)

35.    Plaintiff's retaliation claims stem from her contention that she made "complaints" to Ms. Thompson and Mr. Meyers about the decision to have Ms. Storms and Ms. Tinsky lead the firm's Commercial and International work and having her position rescoped to the Senior Associate level.  (Compl. ¶¶ 55, 61.)  As a result of these so-called complaints, Plaintiff contends

16

that she was forced to sign the April 2011 Memorandum summarizing the terms of her new Senior Associate role and ultimately forced to resign effective October 31, 2011.  (Id. ¶ 63.)

36.    Booz Allen, however, has a non-retaliation policy, and concerns or reports of misconduct or suspected retaliation may be made under this policy through multiple avenues. (Ex. 24, EEO Policy.)  During Plaintiff's deposition, she admitted that she failed to utilize any of these avenues, notwithstanding the fact that Plaintiff herself had conducted investigations under the policy.  (Ex. 2, Pl.'s Dep. Tr. 326:5-13.)  In fact, it is undisputed that Plaintiff never asked anyone at Booz Allen to conduct an investigation into the reasons behind the Law Department's restructuring, despite Mr. Meyers' explicit offer to do so.  (Id., 217:7-9.)  Importantly, all of the decisions regarding Plaintiff's new role within the Law Department were made prior to any of the "complaints" to Mr. Meyers or Ms. Thompson.  (Ex. 11, Pl.'s Answers to Interrog. at 3, 10.)

## IV.    ARGUMENT

### A.    Summary Judgment Standard.

Summary judgment must be granted if a party fails to make a showing sufficient to establish the existence of any essential element of the party's case on which that party has the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Fed.R.Civ.P. 56(c).  A movant need only show an absence of evidence or support for the opposing party's case.  See id.  If the nonmovant fails to identify specific facts that demonstrate a genuine and material issue for trial, then the court must grant summary judgment "to prevent factually unsupported claims and defenses from proceeding to trial."  Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that "existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment") (emphasis added). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." Francis v. Booz, Allen & Hamilton Inc., 452 F.3d 299, 308 (4th Cir. 2006).

> **B.      Title VII and the ADEA.**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). In a Title VII sex discrimination case, the plaintiff has the burden of proving that her employer "intentionally" discriminated against her because of her sex. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–08 (1993).

The ADEA prohibits employers from terminating an employee who is at least 40 years of age "because of" the person's age. 29 U.S.C. §§ 623(a)(1), 631(a). A plaintiff must demonstrate that the employer engaged in disparate treatment "because of" the employee's age and, accordingly, age must be the "but-for" cause of such treatment. Gross v. FBL Fin. Servs., 557 U.S. 167, 177–78 (2009) (rejecting "mixed motive" theory of liability for claims brought under the ADEA); EEOC v. Balt. Cnty., 747 F.3d 267, 272–73 (4th Cir. 2014). Plaintiff's burden of demonstrating the "but-for" causation applies not just at trial, but also at summary judgment. See Harris v. Powhatan Cnty. Sch. Bd., 543 F. App'x 343, 346 n.3 (4th Cir. 2013).

Lacking direct evidence of discrimination under either the ADEA or Title VII, Plaintiff's case proceeds under the familiar burden-shifting framework established in McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 802–04 (1973).[3]  See Hill v. Lockheed Martin Logistics Mgmt.,

Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (applying McDonnell Douglas to ADEA

claim).  Under this approach, Plaintiff first must establish a prima facie case of discrimination

under both the ADEA and Title VII.  If she is able to do so, then "the burden shifts to the

employer to articulate a legitimate, nondiscriminatory reason for the adverse employment

action."  Hill, 354 F.3d at 285.  Then, "the burden shifts back to the plaintiff to prove by a

preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but

were a pretext for discrimination.'"  Id.

### C.  A Powerful Inference Against Discrimination Exists Because Plaintiff was Hired by the Same Person Who Decided on the Alleged Adverse Action.

When the person who hired a plaintiff also made the alleged adverse employment

decision, the Court need not show "strict fealty to proof schemes."  Proud v. Stone, 945 F.2d 796,

798 (4th Cir. 1991).  This is because "[w]hen the hirer and the firer are the same individual, there

is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the

employer."  Id.; see also Spruill v. Kip Killmon's Tysons Ford, Inc., No. 1:12cv806, 2012 U.S.

Dist. LEXIS 146180, at *16 (E.D. Va. Oct. 10, 2012) (Trenga, J.).

It is undisputed that the same person—Mr. Appleby (age 65)[4]—decided to hire Plaintiff

and also made many of the decisions Plaintiff now contends are discriminatory.  Mr. Appleby

---

[3]  Although direct evidence is not required to proceed under a mixed-motive sex discrimination case under Title VII, the ultimate question regarding whether Plaintiff was a victim of intentional discrimination must be answered with sufficient evidence upon which one could find that her gender "actually motivated" the decision.  Hill, 354 F.3d at 285–86.

[4]  A similar presumption exists when the decision maker is in the same protected category as plaintiff.  See Miller v. Locke, No. 1:08-cv-1149, 2009 U.S. Dist. LEXIS 49707, at *19 (E.D. Va. June 12, 2009) (Trenga, J.) (granting summary judgment in part because the decision makers were in the plaintiff's protected class, as were more than a third of plaintiff's co-workers).

decided to hire Plaintiff in 2000, to promote her in 2004 and to appoint her as the practice lead for the firm's Real Estate, Commercial and International operations in 2008.  (See Statement of Facts ("SOF") ¶ 2).  In addition to making the decisions so favorable to Plaintiff, he also made the decisions she now claims are discriminatory.  (SOF ¶¶ 6, 9–10.)[5]  Thus, the undisputed facts establish that Mr. Appleby is the equivalent of "the hirer and the firer," that is, the person who hired and promoted Plaintiff but who also made the allegedly discriminatory decisions.  Proud, 945 F.2d at 798; see also Spruill, 2012 U.S. Dist. LEXIS 146180, at *16.  Accordingly, the Court need not follow the McDonnell Douglas proof scheme and instead should require Plaintiff to rebut the "powerful interference" on "the 'ultimate question' that discrimination did not motivate the employer."  Proud, 945 F.2d at 798; see also Spruill, 2012 U.S. Dist. LEXIS 146180, at *16.  Plaintiff cannot state any undisputed material fact tending to satisfy her burden on this "ultimate question" and for this reason the Court should grant summary judgment in favor of Booz Allen.

### D.      **Plaintiff Cannot Establish a *Prima Facie* Case of Sex or Age Discrimination.**

Even if the Court adheres to the McDonnell Douglas proof scheme, Plaintiff nevertheless cannot satisfy her prima facie burden.   To establish a prima facie case of sex or age discrimination, Plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing her job duties satisfactorily; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

---

[5]      There is no dispute that Mr. Appleby was the decision maker in this case.  Plaintiff claims that Mr. Osborne told her during the January 26, 2011 meeting that it was "his" decision.  (Ex. 2, Pl.'s Dep. Tr. 265:3–6.)  While this fact is disputed, what Mr. Osborne said at the January 26th meeting is immaterial.  First, Plaintiff conceded that she "believe[d] it was a consensus decision," including Mr. Appleby (id., 199:21-200:1); and second, it is undisputed that Mr. Appleby made the ultimate decisions at issue prior to the more relevant January 20, 2011 meeting he had with Messrs. Osborne, Manya and Meyers (SOF ¶¶ 6, 9–11).

Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011); Hill, 354 F.3d at 285; see also Nathan v. Takeda Pharms. Am., Inc., 890 F. Supp. 2d 629, 639–41 (E.D. Va. 2012) (Trenga, J.).[6]  Plaintiff has failed to establish a preponderance of the evidence showing her duties were assumed by others outside of her protected classes.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) ("[P]laintiff . . . must first establish, by a preponderance of the evidence, a 'prima facie' case.").

First, the undisputed facts establish that Plaintiff (female, age 55) was replaced by Debra Storms (female, age 46) and Karen Tinsky (female, age 36).  (SOF ¶ 6.)  Despite the fact that Ms. Storms and Ms. Tinsky are female, Plaintiff nevertheless contends that distributing her work to these women constitutes gender discrimination.[7]  Simply put, Plaintiff cannot satisfy her prima facie burden because her work was given to other women.  Brinkley v. Harbour Rec. Club, 180 F.3d 598, 609 (4th Cir. 1999) (requiring a plaintiff to show that her position remained open or was filled by similarly qualified applicants outside the protected class).

Second, with respect to Plaintiff's claim of age discrimination, Plaintiff must show that she was replaced by employees who were "substantially" younger than she was.  See generally O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996); Dugan v. Albemarle Cnty. Sch. Bd., 293 F.3d 716, 721 (4th Cir. 2002).  In this case, the nine-year difference between Plaintiff and Ms. Storms is insubstantial, particularly given that plaintiff has "not presented one iota of evidence" that Booz Allen considered Plaintiff's age.  See DeBord v. Wash. Cnty. Sch.

---

[6]     It is undisputed that Plaintiff is a member of a protected class, i.e., over 40 and female, and that she was adequately performing her job.  Moreover, for purposes of summary judgment, Booz Allen concedes *arguendo* that Plaintiff's re-scoped job (of which she was notified in January 2011) constitutes an adverse employment action.

[7]     See Ex. 2, Pl.'s Dep. Tr. 39:19–22 ("Q:  [I]s it still your contention in this case that the giving of the commercial work to Ms. Storms occurred because of your gender?  A:  Yes."); id. at 42:4–11 ("Q:  Do you still contend that the moving of the international work to Ms. Tinsky was also because of your gender? . . . A:  Yes.").

Bd., 340 F. Supp. 2d 710, 715–16 (W.D. Va. 2004).  In this regard, Plaintiff has failed to produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." O'Connor, 517 U.S. at 313 (alterations omitted).

Third, Plaintiff has also failed to demonstrate that her Commercial and International roles were filled by "similarly qualified" employees.  Bonds, 629 F.3d at 386; Hill, 354 F.3d at 285; see also Nathan, 890 F. Supp. 2d at 639–41.  To make this showing, Plaintiff should demonstrate that her replacements are "similarly situated with respect to performance, qualifications, and conduct" and that Ms. Tinsky and Ms. Storms "possessed analogous attributes, experience, education, and qualifications." Balderston v. Fairbanks Morse Engine Div. of Coltec Indus., 328 F.3d 309, 322 (7th Cir. 2003).  Here, the undisputed material facts show that Booz Allen reasonably concluded that Plaintiff was less qualified than Ms. Tinsky and Ms. Storms for the significant Commercial and International work it anticipated as a result of the expiration of the non-compete.  (SOF ¶ 10-14, 48-49.)[8]  Accordingly, based upon these undisputed material facts Plaintiff cannot carry her prima facie burden for her gender or age discrimination claims.  See Brinkley v. Harbour Rec. Club, 180 F.3d 598, 610–11 (4th Cir. 1999).

## E.   Defendant's Legitimate, Non-Discriminatory Reason for Its Actions.

Even assuming that Plaintiff could establish a prima facie case of discrimination, Booz Allen has articulated a legitimate, nondiscriminatory reason for the actions Plaintiff alleges are adverse.  As it has consistently stated, Booz Allen restructured the Law Department to prepare

---

[8]      Plaintiff cannot overcome these undisputed facts by pointing to her own belief that she was equally qualified to perform the work as Ms. Storms or Ms. Tinsky.  It is well-settled in this Circuit that an employee's perception of their qualifications is irrelevant. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) ("'It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.")

for reentry into the commercial and international markets at the expiration of the Booz &

Company non-compete.  (SOF ¶¶ 3, 5, 9.)  No evidence suggests the firm's decision was related

to Plaintiff's age or gender.  (SOF ¶¶ 3, 5, 9, 32.)  Booz Allen slotted the Real Estate practice

group lead as a Senior Associate because of the position's anticipated demands and

responsibilities, bringing the position in line with the other two practice leads already slotted as

Senior Associates.  (SOF ¶ 10.)  Plaintiff had a "relative lack of experience" in "area[s] most

important to the present and future needs of the company" and the business decision therefore

constitutes a legitimate, nondiscriminatory reason.  Fields v. Verizon Servs. Corp., 493 F. App'x

371, 376 (4th Cir. 2012); see also Perry v. Computer Scis. Corp., 429 F. App'x 218, 220 (4th Cir.

2011) (finding the existence of a legitimate non-discriminatory reason when an employer does

not promote an employee who lacks the needed experience with its global activities during a

departmental reorganization).  The decision to restructure of the Law Department similarly

serves as "a strategic business decision [which] constitutes a legally sufficient justification."

Fields, 493 F. App'x at 377 (citing Mereish v. Walker, 359 F.3d 330, 335 (4th Cir. 2004)).

### F.    The Undisputed Facts Demonstrate that Plaintiff Cannot Establish Pretext.

Booz Allen's articulation of its legitimate, non-discriminatory reasons shifts the burden

"back to [the plaintiff] to prove by a preponderance of the evidence that the employer's stated

reasons 'were not its true reasons, but were a pretext for discrimination.'"  Hill, 354 F.3d at 285.

Plaintiff must demonstrate that Defendant's explanation for its decisions is not true or "is

unworthy of credence."  Reeves, 530 U.S. at 143.  Plaintiff cannot establish pretext "by focusing

on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points

that are wholly irrelevant to it."  Bonds, 629 F.3d at 386.  At this stage, "[i]t is the perception of

the decision maker which is relevant." Id.; see also Holland v. Wash. Homes, Inc., 487 F.3d 208, 215–18 (4th Cir. 2007).  Plaintiff cannot cite any admissible evidence giving rise to an inference that Defendant's consistent explanation for why it reorganized the Law Department and re-scoped Plaintiff's job was a pretext for intentional discrimination.

If Plaintiff alleges pretext by references to "younger" lawyers or her "retirement," (SOF ¶¶ 26, 30, 34) such allegations are insufficient to rebut Plaintiff's legitimate, nondiscriminatory reasons.  "[A]ny comments related to an interest in a younger work force . . . were not part of any discussions associated with Plaintiff" and are insufficient to establish pretext.  Miller, 2009 U.S. Dist. LEXIS 49707, at *19 (citing Duke v. Uniroyal, 928 F.2d 1413, 1417 (4th Cir. 1991)). Notably, Messrs. Appleby, Osborne, Meyers and Manya "were all over the age of forty and within the same protected class as Plaintiff."  Id.  In fact, two-thirds of the Law Department was over the age of forty and nearly thirty percent were over fifty years old.[9]  (SOF ¶ 34.)

Any pretext argument pertaining to Mr. Meyers' reference to "retirement"—Plaintiff's characterization of her departure (SOF ¶¶ 26, 30, 34)—fails.  This Court has specifically held that "pretext is not established by the simple fact that [the employer] once asked [the employee] about her plans for retirement."  Montgomery v. Ruxton Health Care, IX, LLC, No. 3:06cv024, 2007 U.S. Dist. LEXIS 30898, at *27–28 (E.D. Va. Apr. 26, 2007) (Payne, J.).[10]  Moreover, discussions about retirement occurred well after Mr. Appleby decided to reorganize the Law

---

[9]    In Miller, 2009 U.S. Dist. LEXIS 49707, at *19, the Court found significant that a full one-third of the practice area was over the age of forty.  That significance is amplified in this case given the substantially higher proportion of employees over forty and fifty. (SOF ¶ 34.)

[10]   See also Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1113 (8th Cir. 2001); Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1137 (8th Cir. 2006) (explaining that a supervisor's "reasonable inquiries into an employee's retirement plans do not permit an inference of [age] discrimination").

Department, and only in response to Plaintiff's own comments about her desire to stop working for Booz Allen.  Accordingly, any comment Mr. Meyers made in response to Plaintiff about her retirement is insufficient for her to establish pretext.

Therefore, for the reasons set forth above, summary judgment in Booz Allen's favor is warranted and Plaintiff's gender and age discrimination claims must be dismissed with prejudice.

### G.      Defendant did not Retaliate Against Plaintiff.

Plaintiff alleges Booz Allen retaliated against her when the firm "constructively discharged" her after she complained of discrimination.  (SOF ¶ 35.)  To establish a prima facie case for retaliation, the plaintiff must prove three separate elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events.  EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405–06 (4th Cir. 2005).

#### 1.      Plaintiff did not engage in protected activity.

Plaintiff contends she engaged in protected activity when she asked Senior Vice President of Human Resources Betty Thompson and her supervisor, William Meyers, whether her demotion was the result of discrimination.  (SOF ¶¶ 15, 24, 35.)  To constitute protected activity, Plaintiff must show she reasonably believed the complained-of conduct was unlawful.  See Nathan, 890 F. Supp. 2d at 644.  Whether Plaintiff "reasonably believed" she was opposing unlawful conduct must be measured by an objective standard applied as a matter of law.  Id. (citing Jordan v. Alt. Res. Corp., 458 F.3d 332, 339 (4th Cir. 2006)).

Plaintiff did not even *subjectively* believe she was opposing unlawful conduct because she expressed uncertainty about the reasons for the job change.[11]   Even if Plaintiff *had* a subjective belief that she was opposing unlawful activities, such belief would be insufficient to show she engaged in protected activity.  See Nathan, 890 F. Supp. 2d at 645 (granting summary judgment because "no evidence, other than [Plaintiff's] subjective belief," existed to support claim for discrimination).  Nonetheless, Plaintiff's belief is *objectively* unreasonable because the Commercial and International practice areas were delegated to women, and two-thirds of the Law Department was over the age of forty.  (SOF ¶ 34.)  No reasonable person would believe that the decision to reorganize the Law Department and align all three positions as Senior Associates constituted discrimination under such circumstances.  Accordingly, Plaintiff's isolated comments or questions to Ms. Thompson and Mr. Meyers do not constitute protected activity.

### 2.  The adverse action is not causally related to her alleged protected activity.

Even if the Court finds that Plaintiff engaged in protected activity, the undisputed evidence shows that Plaintiff did not suffer any materially adverse action causally related to her alleged protected activity.  In order to state a claim for retaliation, Plaintiff must establish that her challenged action was "materially adverse, 'which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Nathan, 890 F. Supp. 2d at 646 (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).  Moreover, Plaintiff must establish that the materially adverse employment action was causally

---

[11]   The undisputed facts establish that when Plaintiff "complained" to Ms. Thompson, Ms. Thompson specifically asked Plaintiff if she thought the job change was because of her gender, and Plaintiff responded she didn't know.  (SOF ¶ 15.)  Plaintiff exhibited this same uncertainty to Mr. Meyers.  (SOF ¶ 24.)  This conclusion is highlighted by the fact that Plaintiff declined Mr. Meyers' offer to open an investigation. (SOF ¶ 24.)

related to her protected activity.  Navy Fed. Credit Union, 424 F.3d at 405–06.  To satisfy this standard, Plaintiff must adduce "evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action."  Nathan, 890 F. Supp. 2d at 647.  Any direct evidence Plaintiff cites must "evince retaliatory animus with respect to [her] protected activity."  Mehta v. Potter, No. 1:07cv1257, 2009 U.S. Dist. LEXIS 47203, at *30–31 (E.D. Va. June 4, 2009) (Trenga, J.).  As such, any retaliation could only have occurred after Plaintiff alleges she engaged in protected activity.  Nathan, 890 F. Supp. 2d at 646 n.21.  It is undisputed that Plaintiff questioned Ms. Thompson in March or April 2011 and discussed her belief of discrimination with Mr. Meyers in May 2011.  (SOF ¶¶ 15, 24, 35; Compl. ¶¶ 58, 61.)  In other words, this "protected activity" occurred **after** the alleged "demotion" in January 2011 and thus the "demotion" cannot form the basis for retaliation.  (SOF ¶¶ 11, 13.)

To avoid this obvious conclusion, Plaintiff seems to assert that Mr. Meyers' presentation to Plaintiff of a memorandum, which merely described the previously discussed details of her new position, constitutes an adverse action.  (SOF ¶ 25.)  The memo, however, is neither an adverse action nor causally related to Plaintiff's "protected activity."  Human Resources manager Caroline Wilkie prepared the letter consistent with the firm's general practice for an employee's position or title change.  (SOF ¶ 25.)  No evidence suggests Ms. Wilkie knew of Plaintiff's alleged protected activity, thus eliminating causation.  To the contrary, the undisputed evidence proves the decision to re-scope Plaintiff's job and all of the consequences thereof, including any alleged salary freeze, was made in January 2011, well before any alleged protected activity.  (SOF ¶¶ 15–17.)  Plaintiff herself conceded in her Interrogatory Answers that the decision was a "done deal" well before any alleged protected activity.  (SOF ¶ 13.)  Furthermore, "it is worth

noting that even if the memorandum may be considered a materially adverse action, the undisputed record reflects a clear, non-retaliatory reason for its issuance that is not pretextual." Gordon v. Napolitano, 863 F. Supp. 2d 541, 552 (E.D. Va. 2012).  The firm issued the memo to advise Plaintiff about her new role and make sure the expectations associated with the change were clear given the firm's new fiscal year.  (SOF ¶ 16.)  Thus, there is no factual basis – disputed or otherwise – that Booz Allen engaged in any conduct that would dissuade a reasonable person from engaging in protected activity.

### 3.  Plaintiff was not "constructively discharged."

Plaintiff alleges her resignation was not voluntary; rather, she alleges Booz Allen constructively discharged her.  How Plaintiff's constructive discharge claim relates to her discrimination and retaliation claims is unclear, so Defendant will address it here.  Constructive discharge occurs "if an employer deliberately makes the working conditions intolerable in an effort to induce the employee to quit." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186 (4th Cir. 2004).  Plaintiff must prove "(1) the deliberateness of Booz Allen's actions, motivated by [discriminatory] bias, and (2) the objective intolerability of the working conditions." Id.; see also Freeman v. Dal-Tile Corp., 750 F.3d 413, 425 (4th Cir. 2014) (holding that a plaintiff must "present sufficient evidence to create a question of fact as to whether [her employer] deliberately attempted to induce her to quit" and "that her working conditions at the time she resigned were objectively intolerable.").  The Fourth Circuit has held that claims of constructive discharge must be "carefully cabined" since they can be "open to abuse by those who leave employment of their own accord." Goldsmith v. Mayor and City Council of Balt., 987 F.2d 1064, 1072 (4th Cir. 1993).  For this reason:

28

> [T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.   Every job has its frustrations, challenges and disappointments; these inhere in the nature of work.   An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.

Id.  Recognizing that demotion can "in some cases constitute a constructive discharge," the Court holds that "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  Id. (citing Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004)).

Here, the undisputed facts are clear that Plaintiff was not constructively discharged:

- Booz Allen expressed desire for Plaintiff to remain, and told her she remained eligible for a Principal-level bonus that year and no salary change would occur. (SOF ¶¶ 13, 17.)

- After the meeting, little changed about Plaintiff's day-to-day responsibilities and Messrs. Meyers, Appleby, and Osborne reiterated to Plaintiff that she was a valued member of the Law Department and that they wanted her to stay.  (SOF ¶¶ 6, 13-14, 17.)

- Mr. Meyers took steps to make Plaintiff's 2011 assessment as positive as possible.  The firm gave Plaintiff a $52,000 bonus in 2011.  (SOF ¶¶ 18–22.)

- Mr. Meyers provided Plaintiff with a glowing letter of recommendation at her request after learning of her intent to resign.  (SOF ¶ 25.)

- Plaintiff decided to not only stay with the firm until her replacement was hired, but assisted with the interview process for her replacement and voluntarily selected her own departure date.  Mr. Meyers offered to cancel the candidate search if Plaintiff would stay. (SOF ¶¶ 25, 27–28.)

These facts preclude a claim for constructive discharge when compared to the working conditions of plaintiffs in other cases in which no constructive discharge was found.  See e.g., Honor, 383 F.3d at 187 (claiming the work environment was "miserable" and "professionally unfulfilling" and citing other Fourth Circuit cases involving yelling, poor evaluations, and forcing work while injured).  Even if the working conditions were intolerable, no evidence exists

that Booz Allen deliberately created these conditions to pressure Plaintiff to resign. Accordingly, Plaintiff's allegations of constructive discharge must fail.

### H.      Plaintiff Failed to Avail Herself of Booz Allen's Attempts to Prevent and Correct Discrimination and Retaliation.

Booz Allen has a non-retaliation policy that provides for multiple avenues to report concerns of misconduct or suspected retaliation. (SOF ¶ 36.) Plaintiff was familiar with the policy and she had conducted investigations under the policy. (SOF ¶ 36.) Plaintiff admitted that she failed to utilize any of these avenues, and it is undisputed that Plaintiff declined Mr. Meyers' direct offer to have the firm investigate her concerns. (SOF ¶¶ 24, 36.)

An employer is entitled to summary judgment when (1) the employer exercised reasonable care to prevent and correct illegal activity, and (2) the Plaintiff unreasonably failed to take advantage of such preventative or corrective opportunities provided. Lissau v. S. Food Serv., 159 F.3d 177, 182 (4th Cir. 1998); see also Walton v. N.C. Dep't of Agric. & Consumer Servs., 494 F. App'x 300, 302 (4th Cir. 2012) (discussing the Faragher/Ellerth defense). Booz Allen exercised reasonable care to prevent discrimination and retaliation by promulgating and enforcing its policies prohibiting such illegal behavior and offering to investigate Plaintiff's claims. Plaintiff unreasonably failed to take advantage of such opportunities. Accordingly, Booz Allen is entitled to summary judgment on this ground as well.

## V.      CONCLUSION

For the reasons stated herein and those that may be stated in its reply memorandum and advanced at the hearing, Defendant respectfully moves this Court to grant it summary judgment as to all counts, and dismiss Plaintiff's claims in their entirety with prejudice.

BOOZ ALLEN HAMILTON INC.

By Counsel

                    /s/
_____
Stephen W. Robinson (VSB #15337)
Sarah A. Belger (VSB #67947)
Melissa L. Taylormoore (VSB #75506)
MCGUIREWOODS LLP
1750 Tysons Blvd., Suite 1800
Tysons Corner, VA 22102
Telephone: (703) 712-5469
Facsimile: (703) 712-5258
srobinson@mcguirewoods.com
sbelger@mcguirewoods.com
mtaylormoore@mcguirewoods.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of January, 2015, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing (NEF) to the parties listed below.  I further certify that a true copy of the foregoing will also be served via electronic mail on the following:

> John R. Ates (VSB #71697)
> Ates Law Firm, P.C.
> 1800 Diagonal Road
> Suite 600
> Alexandria, VA  22314
> 703-647-7501 (T)
> 703-229-6430 (F)
> j.ates@ateslaw.com

I also certify that a true copy of the foregoing will be served via electronic mail and first class mail upon the following non-filing user:

> Linda M. Correia (admitted *pro hac vice*)
> Correia & Puth, PLLC
> 1775 K Street, N.W., Suite 600
> Washington, D.C.  20006
> 202-349-1044 (Direct)
> 202-602-6501 (F)
> 202-602-6500 (T)
> lcorreia@correiaputh.com
> *Counsel for Plaintiff*

> /s/
> _____
> Stephen W. Robinson (VSB #15337)
> *Counsel for Defendant Booz Allen Hamilton Inc.*
> MCGUIREWOODS LLP
> 1750 Tysons Blvd., Suite 1800
> Tysons Corner, VA 22102
> Telephone: (703) 712-5469
> Facsimile: (703) 712-5258
> srobinson@mcguirewoods.com

62563155_6