UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

_____

CARLA CALOBRISI                          )
              Plaintiff,            )
    v.                                   )
                        )      Case No. 1:14-cv-00996-AJT-TRJ
BOOZ ALLEN HAMILTON INC.,                )
              Defendant.           )
_____)

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Carla Calobrisi respectfully responds to and opposes Defendant's Motion for Summary Judgment. Plaintiff has developed ample record evidence from which a reasonable jury could conclude that Booz Allen Hamilton ("Booz Allen" or "Defendant") discriminated against her, misled her about her impending expanded role in the Law Department ("LD"), demoted her as it had several successful, experienced women before her, retaliated after she complained about sex and age discrimination, and explicitly foresaw that its actions would create an intolerable working environment for Ms. Calobrisi. For all of these reasons, the motion should be denied.

From 2008 through 2010, LD managers told Ms. Calobrisi her commercial and international practices would expand, and she reasonably anticipated that she would secure a team of lawyers to support her expanded practice, as male lawyers' teams had grown with their practices. She and her supervisor, Deputy General Counsel and Vice President William Meyers, discussed the opportunity that it would present for promotion to Vice President. In January 2011, Booz Allen abruptly demoted Ms. Calobrisi from Principal to Senior Associate ("Sr. Associate"), telling her she no longer would be practice lead for commercial and international, and her work would be taken away and assigned to younger, less experienced attorneys.

Defendant's contention that Ms. Calobrisi's sex and age discrimination claim fails because

the "same actor," C.G. Appleby, decided to hire, promote, and fire her is meritless. Several contemporaneous documents and testimony rebut the notion that Mr. Appleby acted alone and a reasonable jury could conclude that Defendant concocted this defense to cover up intentional discrimination. For example, Mr. Appleby testified that he alone made the decision to demote Ms. Calobrisi and take away her work, yet Mr. Osborne testified that it was a "consensus" decision. In January 2010, Mr. Appleby had announced his plan to retire from Booz Allen in July 2011 and Mr. Osborne began devising how he would structure and run the LD. A reasonable jury could question and reject that Mr. Appleby, in January 2011, would decree that Ms. Calobrisi should be demoted just six months before he planned to leave. Contemporaneous emails and other documents reveal that Messrs. Osborne, Meyers, and Douglas Manya and members of the Booz Allen Leadership Team, Mr. Strickland and Mr. Rozanski, at least as early as October 22, 2010, already had decided explicitly, [REDACTED]. Two days prior, Mr. Osborne had asked Mr. Meyers for Ms. Calobrisi's "roles and goals," in preparation for "tomorrow's meeting." As such, a reasonable jury could reject Mr. Appleby's testimony.

Discovery has revealed evidence upon which a reasonable jury could conclude that Booz Allen's decisions to take away Ms. Calobrisi's work and demote her were based on her age and sex. For example, in an August 10, 2010 email, Mr. Osborne crafted a set of "idea starters," which included "Law dept demographics: age distribution" as he prepared for the LD's future role. He testified that this document was the "seed" of the "deck" that became his central planning tool for the February 15, 2011 Cosmos Club meeting with Messrs. Osborne, Meyers, Manya, and Appleby, where the agenda included "Implications for staffing: Do we have the right people with the right skill sets and in the right numbers to meet future needs." Because the decision to demote Ms. Calobrisi and assign her work to younger, less experienced attorneys took place in this substantive

and temporal context, summary judgment should be denied.

A reasonable jury could conclude that the decisions also were infected with sex discrimination as evidenced by the pattern of 15 other women over the age of 40, who similarly had risen through the ranks and then had their work abruptly taken away despite excellent performance, or were otherwise marginalized or forced to resign.

Defendant's motion also must fail as to Ms. Calobrisi's retaliation claim. There is no dispute that Ms. Calobrisi spoke with Betty Thompson, Vice President and Chief Personnel Officer, about her demotion and her sex and age. That conversation was protected activity. As documented by Booz Allen's HR department, it was only *after* Ms. Calobrisi complained about sex and age discrimination that Booz Allen insisted that she sign a letter containing the false statement that she "voluntarily accepted" the terms of her demotion. Mr. Meyers testified that Ms. Calobrisi did not have the option of continuing to work at Booz Allen without signing the letter. A reasonable jury also could conclude that Booz Allen created the false document to cast her demotion as a "voluntary transfer" from Principal to Sr. Associate in an effort to cover up discrimination. Furthermore, a reasonable jury could find that Ms. Calobrisi was constructively discharged because her resignation was the reasonably foreseeable consequence of Booz Allen's conduct. Accordingly, summary judgment should be denied.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1. Booz Allen demoted Plaintiff Carla Calobrisi, a 55 year-old woman at the time of her demotion, after she spent eleven years rising through the ranks of Booz Allen's Law Department. (Ex. 1, Compl.) When she was demoted, Ms. Calobrisi was a Principal and was the team lead of three practice areas: Commercial, International Operations, and Global Real Estate. (*Id.*) She provided legal counsel to support Booz Allen's contracts for commercial clients, vendor/supplier

contracts for infrastructure support in the U.S. ("commercial"), as well as contracts for work outside the U.S., international commercial business, and global infrastructure ("international"), and real estate. (Ex. 2, Carla Calobrisi ("Cal.") Tr. 186:2-190:1, 351:21-353:5.) She set up offices, including negotiating leases, handling local employment contracts, opening bank accounts, registering business in foreign countries, relocating employees, and international commercial contracts. (*Id.*; Ex. 3, BAHCAL 110000921-923.) **(Dispute D's SOF ¶ 4, 9, 12, 19.)**

2.  Ms. Calobrisi was hired on April 10, 2000 as Associate General Counsel at the Sr. Associate level, bringing with her approximately 14 years of legal experience. (Ex. 4, BAHCAL 040000134; Ex. 5, CC 00317-319.) In 2003, she was promoted to Principal. (Ex. 6, BAHCAL 040000054-69.) In 2008, Booz Allen Hamilton and Booz & Company split as part of the Carlyle Transaction, and entered into a non-compete agreement that prevented Booz Allen from engaging in some of the work for which Ms. Calobrisi had been responsible. (Ex. 2, Cal. Tr. 167:7-15.) Booz Allen immediately began planning how to re-enter the commercial and international markets when the non-compete expired in July 2011. (*Id.* 186:2-187:18.) Ms. Calobrisi held a significant role in such planning and drove business for what was expected to be "exponential growth" in the commercial and international markets following the expiration of the non-compete. (*Id.*; Ex. 7, Meyers 2 Tr. 172:13-174:4; Ex. 8, Manya Tr. 63:8-66:11; Ex. 9, Appleby 2 Tr. 18:2-12, 47:10-48:20.) **(Dispute D's SOF ¶ 3, 4, 9, 12, 19.)**

3.  During the three years covered by the non-compete agreement, Mr. Meyers, and other members of the firm, such as Mr. Appleby, assured her that when the non-compete expired, the commercial and international parts of her practice would expand and thus she prepared and reasonably expected these parts of her practice to grow significantly in 2011. (Ex. 10, Meyers 1 Tr. 19:4-20:1; Ex. 2, Cal. Tr. 183:3-187:18;196:6-197:11.) During the time that Ms. Calobrisi was

expanding her practice beyond real estate to include the commercial and international work, Mr. Meyers remained focused solely on employment matters. (Ex. 11, Cal. Ans. to Interrogs. at 52; Ex. 12, BAHCAL 030002602.) Ms. Calobrisi developed significant experience in commercial and international matters, and in 2009, recognizing her skills, Mr. Appleby assigned Ms. Calobrisi to lead the commercial practice in the LD and it was her responsibility to drive the agenda and lead other members of her group. (Ex. 9, Appleby 2 Tr. 37:18-21; 39:18-40:15; Ex. 13, BAHCAL 050000030-34.) Ms. Calobrisi also co-formed the International Operations Working Group, which focused on rebuilding (staff) competencies that were lost in the Carlyle Transaction to prepare Booz Allen to expand on an international basis after the expiration of the non-compete. (Ex. 2, Cal. Tr. 186:2-187:18.) **(Dispute D's SOF ¶ 3, 4, 9.)**

4.   In May 2010, during Ms. Calobrisi's assessment, the firm recognized that Ms. Calobrisi "took her role to new levels this year, demonstrating her ability to build the institution," that she "projects self-confidence, authority and enthusiasm in her leadership style," that she has "strong subject matter expertise and business acumen" and that her "biggest area of impact this year is highlighted in her thought leadership, strong collaboration and communication style that she exhibited through several initiatives." (Ex. 3, BAHCAL 110000921-923.) Moreover, in 2010, Ms. Calobrisi was ranked in the top 6% as a High Professional in Booz Allen's 9-Box system,[1] meaning that she was a "consistent top performer" who was "recognized [as a] functional, technical, managerial expert." (Ex. 14, BAHCAL 110000959; Ex. 15, BAHCAL 110000339.) **(Dispute D's SOF ¶ 9-12, 19.)**

5.   Despite her accolades, Messrs. Osborne, Meyers, Manya, and members of the Booz Allen

---

[1]   The 9-Box is a "management tool" used to "look at the pipeline for candidates that are progressing, and ready for promotion." (Ex. 34, Thompson Tr. 91:19-92:1.)

Leadership Team, Mr. Strickland and Mr. Rozanski, but not Mr. Appleby, participated in discussions at least as early as October 22, 2010, where they decided explicitly that [REDACTED]. (Ex. 16, BAHCAL 110000337-338, Ex. 17, BAHCAL 120000001-03, Ex. 18, Metadata showing last update October 22, 2010.) In an October 20, 2010 email, Mr. Osborne asked Mr. Meyers for Ms. Calobrisi's "roles and goals," an HR planning tool, in preparation for "tomorrow's meeting." (Ex. 19, BAHCAL 050000003, 030002791.) **(Dispute D's SOF ¶ 5, 6, 9-11, 29.)**

6.   Mr. Meyers misled Ms. Calobrisi shortly thereafter in December 2010, when he told her that it was going to be her "time to shine" because her practice was about to significantly expand due to the expiration of the non-compete agreement. (Ex. 2, Cal. Tr. 196:6-197:11; Ex. 10, Meyers 1 Tr. 19:4-20:1) At that time, Ms. Calobrisi also was directed to "assume a leadership role within the LD for the firm's expanded International work and serve as the LD's primary interface with the X-team construct supporting International," (Ex. 20, BAHCAL 030003497) making her the "POC" (point of contact) for International on the X-team, and discussing a promotion to Vice President. (Ex. 21, BAHCAL 030002994-2995; Ex. 2, Cal. Tr. 190-195.) Meanwhile, Mr. Meyers proposed hiring an attorney to handle commercial contracting ("someone to take that function over from Carla"). (Ex. 22, BAHCAL 050000482.) Despite the impending expansion, Ms. Calobrisi never received additional staffing (such as another attorney) despite repeated requests and substantial workload as a team lead (with every expectation that it was about to increase exponentially), even though both Messrs. Manya and Meyers had at least four attorneys working for them. (Ex. 11, Cal. Ans. to Interrogs. at 18; Ex. 12, BAHCAL 030002602; Ex. 7, Meyers 2 Tr. 132:17-133:3, Ex. 2, Cal. Tr. 190-195.) **(Dispute D's SOF ¶ 9-10.)**

7.   Ms. Calobrisi was a much more experienced attorney than Messrs. Meyers and Manya – she had been practicing law since 1983, while Mr. Meyers began practicing law in 1992, and Mr.

Manya in 1996. (Ex. 5, CC 00317-319; Ex. 7, Meyers 2 Tr. 8:11-12; Ex. 8 Manya Tr. 22:13.) Both

men are 12 years younger than she. (Ex. 7, Meyers 2 Tr. 87:20-21; Ex. 8, Manya. Tr. 105:2-5.) In

2005, Mr. Manya left the firm because he was not promoted to Principal. (Ex. 8, Manya Tr. 19:18-

20:7.) Within six months, Booz Allen secured his return and promoted him to Principal in 2006.

(*Id.* 20:8-21:9.) Mr. Manya was then selected (over Ms. Calobrisi) to serve as the attorney on the

Carlyle transaction, which positioned him for career advancement, and in 2010, Booz Allen

promoted him to Vice President. (*Id.* 26:7-32:22, 33:6-7.) Similarly, in 2002, Mr. Meyers was

promoted to Principal (just before Ms. Calobrisi), despite the fact that Ms. Calobrisi had been

practicing law longer than Mr. Meyers and they both worked for over eight years in the LD at a

similar level; in 2006, Booz Allen promoted Mr. Meyers to Vice President and did not promote

Ms. Calobrisi. (Ex. 1, Compl. ¶ 22; Ex. 7, Meyers 2 Tr. 15:5-6, 16:8-14, 28:17-29:14.) As a result,

these younger, less experienced, male attorneys were promoted to Vice President in approximately

4-5 years, but Ms. Calobrisi was not promoted after 8 years. (Ex. 7, Meyers 2 Tr. 15:5-6, 16:8-14,

28:17-29:14; Ex. 8, Manya Tr. 19:8-17, 33:6-7.) Both Messrs. Meyers and Manya received higher

compensation than Ms. Calobrisi; in 2010 Mr. Meyers made $195,000 more than she. (Ex. 23,

30(b)(6) Tr. 140:20-142:7-8; Ex. 24, CC 00826.) **(Dispute D's SOF ¶ 9, 12, 32-33.)**

8.   However, without any logical explanation, Booz Allen began taking away her work and

redistributing it to Messrs. Manya and Meyers, and two Senior Associates under their supervision,

Debra Storms and Karen Tinsky, less experienced women 9 to 19 years younger than she. (Ex. 2,

Cal. Tr. 351:13-352:17; Ex. 25, BAHCAL 030002810-2811; Def.'s Mem. at 21.) Mses. Storms

and Tinsky had much less experience than Ms. Calobrisi in international and commercial, (Ex. 2,

Cal. Tr. 351:13-352:17; Ex. 63, BAHCAL 110000960-963; Ex. 26, BAHCAL 110000439-440)

and Ms. Calobrisi was concerned that her work was being given to less experienced attorneys,

which she discussed with Mr. Meyers on several occasions. (Ex. 2, Cal. Tr. 179:6-181:10, 351:13-352:17.) **(Dispute D's SOF ¶ 7-8, 30-33.)**

9. Unbeknownst to Ms. Calobrisi, Messrs. Osborne, Meyers, Manya, and Appleby were planning to demote Ms. Calobrisi. In January 2010, Mr. Appleby announced his retirement for July 2011, and by June 2010, gave Mr. Osborne the authority to make future staffing decisions. (Ex. 9, Appleby 2 Tr. 117:7-118:8; Ex. 27, Appleby 1 Tr. 28:5-16.) Mr. Appleby testified that staffing decisions "would have been under his [Mr. Osborne's] watch to figure out" and he divorced himself from planning the LD budget, passing all budget responsibilities to Mr. Osborne because he was "getting ready to retire." (Ex. 9, Appleby 2 Tr. 11:16-12:22, 24:16-26:1.) Mr. Osborne took over the role and, in August 2010, expressed an interest in creating a "value model" for the LD that considered "law dept [sic] demographics," including <u>age distribution</u>" in the LD. (Ex. 28, BAHCAL 030002987-89.) Mr. Osborne testified that this document was the "seed" for the February Cosmos Club meeting to discuss "Implications for staffing: "do we have the right people with the right skill sets and in the right numbers" (Ex. 29, BAHCAL 010000058-59; Ex. 30, BAHCAL 030002607), which ultimately led to the deck presented at the June 2011 LD off-site where he laid out his "vision" for the LD. (Ex. 31, Osborne 2 Tr. 23:9-19.) Mr. Osborne wanted to hire more junior attorneys in the LD, and he announced to the LD, and Ms. Calobrisi directly, his plan to hire "younger, less experienced" attorneys. (Ex. 2, Cal. Tr. 340:7-19, 349:1-10; Ex. 32, Osborne 1 Tr. 51:12-16; 74:6-12; Ex. 29, BAHCAL 010000058-59.) **(Dispute D's SOF ¶ 5-6, 9-11, 29-30, 32-33.)**

10. On January 14, 2011, Mr. Osborne sent an email to Messrs. Appleby, Meyers, and Manya explaining that because he had observed a "significant uptick" in international and commercial matters he wanted to take a "fresh look" at the practice groups to discuss the "composition and

leadership of the core teams" and he proposed meeting early the next week. (Ex. 33, BAHCAL 030001081.) Just six days later, on January 20, 2011, Messrs. Osborne, Meyers, Manya, and Appleby made a "consensus" decision to demote Ms. Calobrisi. (Ex. 32, Osborne 1 Tr. 20:19-21:13; 24:18-22; 27:14-19) (Ex. 34, Thompson Tr. 34:13-15) ("C.G. [Appleby], Bob [Osborne], and Bill [Meyers] were the decision makers.") (Ex. 2, Cal. Tr. 199:21-200:20.) (Mr. Osborne told Ms. Calobrisi that he had decided to demote her and give her international and commercial work to Mses. Tinsky and Storms.) **(Dispute D's SOF ¶ 5-6, 9-11, 29.)**

11. At that time, Mr. Meyers, with approval from Messrs. Osborne, Manya, and Appleby created a list of "Talking Points," to handle the demotion meeting. (Ex. 35, BAHCAL 030000110-112.) The talking points made clear that the demotion was "not a choice" – she could accept the demotion or be "transitioned out of the firm." (*Id.*; Ex. 10, Meyers 1 Tr. 79:2-16.) The demotion was not based on her performance. (Ex. 35, BAHCAL 030000110-112.) Messrs. Osborne, Meyers, Manya, and Appleby planned when to inform Ms. Calobrisi of her demotion and staged an invitation – not telling her about the meeting "until that day," and telling her (falsely) it was "to discuss International and Commercial." (Ex. 36, BAHCAL 030000109.) **(Dispute D's SOF ¶ 13.)**

12. On January 26, 2011, Ms. Calobrisi arrived for the meeting with Messrs. Osborne, Meyers, and Appleby with "her file with all the work [she] had done on international and commercial for the last six months, expecting to talk about it." (Ex. 2, Cal. Tr. 207:1-6; Ex. 37, BAHCAL 03000117-119.) Instead, Booz Allen demoted Ms. Calobrisi from her Level 5 Principal position to a Level 4 Sr. Associate position, at age 55, despite the fact that she had been a Principal at the firm for eight years and a top-performing attorney for eleven years. (Ex. 2, Cal. Tr. 200:7-20; Ex. 3, BAHCAL 110000921-923; Ex. 27, Appleby 1 Tr. 25:22-26:3; Ex. 9, Appleby 2 Tr. 67:3-4.) Ms. Calobrisi was completely shocked, especially because just a few weeks prior to the demotion, the

LD gave her the International coordinator role and assigned her to be the LD's International representative on the X-Team. (Ex. 20, BAHCAL 030003497; Ex. 7, Meyers 2 Tr. 83:5-12; Ex. 2, Cal. Tr. 204:21-205:13.) In the meeting, Mr. Osborne told her that her commercial work would go to Ms. Storms (Ex. 2, Cal. Tr. 200:7-20), even though Ms. Storms's capabilities centered primarily on intellectual property and not commercial work. (Ex. 38, BAHCAL 110000444.) Ms. Calobrisi's international work would go to Ms. Tinsky even though Ms. Tinsky did not have sufficient experience in the international market. (Ex. 2, Cal. Tr. 32:17-21, 200:7-20.) Messrs. Osborne, Meyers, and Appleby explained to Ms. Calobrisi that she had "no choice" in the demotion. (Ex. 35, BAHCAL 030000110-112.) Ms. Calobrisi's salary was effectively reduced – her base salary was capped for the foreseeable future, she would no longer be eligible for Principal-level bonuses after April 2011 (the end of Booz Allen's 2011 fiscal year), and she lost significant benefits only available to Principals. (Ex. 24, CC 00826.) The sum of these actions was "career-ending." (Ex. 2, Cal. Tr. 287:18.) **(Dispute D's SOF ¶¶ 7-8, 13.)**

13. During the demotion meeting, Ms. Calobrisi asked what she had done wrong, but they told her that she should consider "the positive in being demoted." (Ex. 2, Cal. Tr. 205:10-15, 206:18-21.)  Immediately following the demotion meeting, Mr. Appleby told Ms. Calobrisi privately that she was a better lawyer than Mses. Tinsky and Storms and that Mr. Osborne decided to demote her and that he had to make his own mistakes. (*Id.* 207:7-208:1.) Later the following week, Mr. Appleby again approached Ms. Calobrisi indicating that her demotion was the first of a two-step process, suggesting that when he left in July 2011, Ms. Calobrisi would likely not have a job. (*Id.* 208:16-210:7.) Ms. Calobrisi asked Mr. Appleby what she could do to get her Principal position back and he said the decision was made and it was "a done deal." (*Id.* 266:4-15.) Mr. Osborne also told her she could not get her position back. (*Id.*) However, Mr. Appleby believed there was

nothing that Ms. Calobrisi "couldn't have done" (Ex. 27, Appleby 1 Tr. 15:15-17) and that she "could have done that [international and commercial] work" that was given to Mses. Storms and Tinsky. (Ex. 9, Appleby 2 Tr. 36:6-19.) After working with her for eleven years, he found her to be an excellent attorney. (Ex. 27, Appleby 1 Tr. 20:4-19.) In contrast, he stated that Ms. Storms was "not the deepest thinker." (Ex. 9, Appleby 2 Tr. 32:9-12.) Similarly, Ms. Molly Finn, a former Partner at Booz Allen, stated that she "had a more negative impression of Debra [Storms] based on lack of knowledge of the issues; she did not add value; seemed very inexperienced in general, and inexperienced definitely in the infrastructure business." (Finn Tr. 79:14-80:8.) Joan Hyde, a former Booz Allen Vice President, felt that Ms. Storms's "skill set was lacking," and "asked for her to be taken off an issue more than once." (Ex. 39, Hyde Tr. 46:17-22.) When Ms. Calobrisi was demoted, Ms. Tinsky was 36 years of age, Ms. Storms was 46, Messrs. Manya and Meyers were 43. (Ex. 7, Meyers 2 Tr. 87:20-21; Ex. 8, Manya Tr. 105:2-5.) **(Dispute D's SOF ¶ 7-9.)**

14. Ms. Calobrisi was mortified by her demotion. (Ex. 2, Cal. Tr. 234:7-22.) She was a leader in the LD and had an active role in the Booz Allen company-wide Diverse Women's Mentoring Circle as a mentor to female Senior Associates. (Ex. 34, Thompson Tr. 35:1-41:1.) These women looked to Ms. Calobrisi for her leadership and she was concerned about how her demotion would impact her visible leadership role to other women, especially since she had significantly less work to do after her demotion. (*Id.*; Ex. 2, Cal. Tr. 152:9-13.) **(Dispute D's SOF ¶ 14.)**

15. On March 24, 2011, Ms. Calobrisi met with the Chief Personnel Officer and Senior Vice President of Human Resources, Betty Thompson, to raise her concerns about her demotion. (Ex. 2, Cal. Tr. 274:22-275:6.) Ms. Calobrisi first heard her demotion referred to as being "rescoped" during that meeting. (*Id.* 274:4-5.) She told Ms. Thompson that she was concerned whether her demotion was because of her sex and age. (Ex. 34, Thompson Tr. 31:11-32:6; Ex. 2, Cal. Tr.

273:20-274:9.) Ms. Calobrisi believed her demotion was due to her sex and age because her work was diverted to younger women and men, she heard and was the recipient of various comments concerning gender and age by Messrs. Appleby, Meyers, and Osborne, and the way she was marginalized was "typical" based on her observations of Booz Allen's discriminatory treatment of other older women who had been pushed out of the company before her. (Ex. 2, Cal. Tr. 16:8-17:18, 22:13-24:16, 180:7-13; 203:12-13.) Ms. Calobrisi raised her complaint to Ms. Thompson because she felt it would be "hopeless" to complain to anyone in the LD since they were responsible for the discrimination, and any complaint merely went to the LD. (*Id.* 176:9-15; Ex. 23, 30(b)(6) Tr. 97:2-14.) During that meeting, Ms. Calobrisi also sought guidance about how to continue her work on the Diverse Women's Mentoring Circle as a Sr. Associate, and Ms. Thompson encouraged her, saying she could be the "poster child of a woman who was demoted from Principal to Sr. Associate but who could remain with the firm." [2] (Ex. 11, Cal. Ans. to Interrogs. at 35.) Nonetheless, Ms. Thompson emailed the Diversity Director to ask whether Ms. Calobrisi should do so. (Ex. 40, BAHCAL 050000573-574.) **(Dispute D's SOF ¶ 13, 15, 35.)**

16. Following Ms. Calobrisi's complaint to Ms. Thompson, Mr. Meyers and Ms. Wilkie, an HR administrator, drafted a demotion letter for Ms. Calobrisi's signature that stated (falsely) she "approve[d] and voluntarily accept[ed] the terms" of the demotion, which was approved by Messrs. Appleby and Osborne. (Ex. 24, CC 00826; Ex. 42, BAHCAL 030001461-62.) Earlier emails between Mr. Meyers and Ms. Wilkie (prior to Ms. Calobrisi's complaint) reveal that the "voluntariness" of her demotion was not contemplated until after Ms. Calobrisi complained of sex

---

[2]     When Ms. Calobrisi discussed her continued participation with the Diverse Women's Mentoring Circle with Mr. Meyers, he encouraged her to continue her work, but worked behind her back to undermine her leadership. (Ex. 41, BAHCAL 050000091-93.) (forwarding her email to Mr. Manya saying that they had to "shut down the Calobrisi/Vaeth School of Hard Knocks").

and age discrimination. (Ex. 43, BAHCAL 030000080.) The talking points and demotion meeting show that her demotion was "not a choice" and her position was "going to become a Sr. Associate level role," and "if that is not acceptable to you we can discuss a transition plan out of the firm." (Ex. 35, BAHCAL 030000110-112.) Mr. Meyers testified that he "did not force" Ms. Calobrisi to sign the letter, but she could only keep the Sr. Associate role by signing it. (Ex. 10, Meyers 1 Tr. 78:11-79:16.) Ms. Calobrisi was faced with the impossible decision to sign the letter affirming her demotion as "voluntary," or to refuse to sign and be left jobless. Ms. Calobrisi needed a paycheck and thus signed the letter on April 5, 2011; she felt she had no choice. (Ex. 2, Cal. Tr. 367:8-17.) Ms. Calobrisi "knew exactly everything that was in that letter with the exception" that the demotion was "voluntary." (*Id.* 279:14-17.) Defendant asserts that Ms. Calobrisi's demotion letter was "standard policy," yet neither Mses. Tinsky nor Storms received a similar letter, despite changes to their jobs. (Ex. 7, Meyers 2 Tr. 203:1-12.) **(Dispute D's SOF ¶ 16, 35.)**

17. The involuntary nature of the demotion was reconfirmed in an email from Ms. Calobrisi's assessor, Jennifer Gleich, to Mr. Rozanski, of the Leadership Team, indicating that Mr. Meyers would speak to Mr. Osborne about a package for Ms. Calobrisi, and that the message to her would be "either take the senior associate (embrace it, stop complaining) or the package (Betty [Thompson]'s idea – give her an option, <u>demote or leave</u>)." (Ex. 62, BAHCAL 110000948.) **(Dispute D's SOF ¶ 17.)**

18. On May 31, 2011, Mr. Meyers and Ms. Gleich gave Ms. Calobrisi her annual assessment. (Ex. 44, BAHCAL 030002479; Ex. 2, Cal. Tr. 13-14.) As planned in emails between Mr. Meyers and Ms. Gleich, the message to Ms. Calobrisi was [REDACTED] and [REDACTED] with your demotion. (Ex. 45, BAHCAL 05000524-525.) During that meeting, Mr. Meyers said he was aware of Ms. Calobrisi's complaint of gender and age discrimination. (Ex. 2, Cal. Tr. 214:2-215:2; Ex.

7, Meyers 2 Tr. 206:13-207:11.) Ms. Calobrisi confirmed to him and Ms. Gleich that she believed her demotion was due to her age and gender. (*Id.*; Ex. 46, Gleich Tr. 67:10-68:1.) Mr. Meyers replied that if she could not "get over it," then she should leave the firm and he discussed a package to transition her out of the firm. (Ex. 2, Cal. Tr. 214:17-22, 327:5-21.) **(Dispute D's SOF ¶ 17-20, 23-24.)**

19. The following day, June 1, 2011, Mr. Meyers contacted a legal headhunter to help recruit Ms. Calobrisi's replacement. (Ex. 47, BAHCAL 030000073-74.) On June 2, 2011, he referred, for the first time, to Ms. Calobrisi's separation as a "retirement," that it would be like "Joan [Hyde]" and that the firm would announce Ms. Calobrisi's "retirement." (Ex. 48, BAHCAL 030000734; Ex. 7, Meyers 2 Tr. 216:7-20; Ex. 2, Cal. Tr. 24:1-16.) Mr. Osborne thought this was a "win-win." (Ex. 48, BAHCAL 030000734.) In an effort to maintain her dignity, she eventually adopted this characterization, as Ms. Hyde had. (Ex. 2, Cal. Tr. 18:9-21:11.) **(Dispute D's SOF ¶ 25-26, 34.)**

20. On June 29, 2011, Ms. Calobrisi again told Mr. Meyers that her demotion was discriminatory. (Ex. 49, BAHCAL 030000061.) He dismissed her complaints and was much more concerned with [REDACTED]. (Ex. 50, BAHCAL 030000063-64.) In an effort to salvage her career and stay at Booz Allen, Ms. Calobrisi inquired into two other Principal positions at Booz Allen. (Ex. 2, Cal. Tr. 281:16-283:22.) Those responsible for hiring told Ms. Calobrisi that her reputation at Booz Allen was ruined and strongly discouraged her from applying, indicating that she would not be considered. (*Id.* 281:16-283:22.) Ms. Calobrisi eventually agreed to stay at Booz Allen only until her replacement was hired. (*Id.* 21:7-11.) Ms. Calobrisi assisted Mr. Meyers, but did not make any final decision, with hiring her replacement, a younger, less experienced male attorney Kamaal Jones. (*Id.* 308:1-3, 318:12-319:16; Ex. 51, BAHCAL 16000060-61; Ex. 52, BAHCAL 030002905-2906.) After Mr. Meyers asked her to stay to help train Mr. Jones, Ms.

Calobrisi agreed and her last day at Booz Allen was October 31, 2011. (Ex. 53, BAHCAL 050000242-244; Ex. 2, Cal. Tr. 359:8-22.) **(Dispute D's SOF ¶ 25, 27-28.)**

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994). When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson*, 477 U.S. at 255. There are material facts in dispute if, after viewing the record, there is evidence from which a reasonable jury could find in Plaintiff's favor. *Anderson*, 477 U.S. at 255.

## LEGAL FRAMEWORK FOR TITLE VII AND ADEA DISCRIMINATION AND RETALIATION CLAIMS

To establish a prima facie case of sex and age discrimination, a plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *Young v. UPS*, 707 F.3d 437, 450 (4th Cir. 2013). The fourth element concerns whether the defendant's decision occurred "under circumstance[s] giving rise to an inference of unlawful discrimination." *Id*. at 450 n.17 (quoting *Mackey v. Shelala*, 360 F.3d 463, 468 (4th Cir. 2004); *Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002). A similar analysis is conducted for age discrimination claims. *Id.* at 720.

The 4th Circuit recognizes exceptions to the rule that a plaintiff must show replacement by

someone outside their protected class to make out a prima facie case – these exceptions include, but are not limited to: "cases where (1) an age discrimination plaintiff is replaced by a much younger person within the same class . . . and (3) the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination." *Miles v. Dell, Inc*., 429 F.3d 480, 486-487 (4th Cir. 2005) (overturning district court's finding of summary judgment for employer where female employee was replaced by another female); *see also Lettieri v. Equant, Inc*., 478 F.3d 640, 647-48 (4th Cir. 2007) (overturning district court where it was uncontested that plaintiff satisfied the first three elements of the prima facie case, and *Miles* relieved her of showing she was replaced by someone outside her protected class). Once the plaintiff establishes her prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Lettieri*, 478 F.3d at 646-647. The plaintiff must then show that the employer's proffered reason for taking the adverse employment action is actually a pretext for discrimination. *Id*. The standard for a plaintiff's prima facie case "was never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

## ARGUMENT

### I. PLAINTIFF PROVIDES SUFFICIENT EVIDENCE FROM WHICH A JURY COULD REASONABLY CONCLUDE SHE WAS DEMOTED BECAUSE OF HER SEX AND AGE

As set forth below, Ms. Calobrisi has met her burden of showing a prima facie case of sex and age discrimination and has shown pretext. Ms. Calobrisi meets the first two prongs because she is a woman over age 40 with an excellent performance record. (SMF ¶1, 4.)

### A. Booz Allen is Not Entitled to a "Same Decision Maker" Inference

Defendant's reliance on *Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991) is misguided. Booz Allen's own "evidence presents a genuine issue of fact as to who made the decision to terminate

[plaintiff], and thus whether the same actor inference should apply." *Burgess v. Bowen*, 466 Fed. App'x. 272, 280 n.4 (4th Cir. 2012) (holding that reliance on the "same actor" inference at the summary judgment stage is misplaced where there exists a factual dispute regarding who hired and fired the plaintiff); *see also Campbell v. Galloway*, 483 F.3d 258, 272 (4th Cir. 2007) (discussing a *Proud* argument as "challenging the sufficiency of the evidence").[3] Moreover, the drawing of inferences in favor of the moving party is not proper at the summary judgment stage. *See Lettieri*, 478 F.3d at 462 ("[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."); *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

There is a genuine issue of material fact as to who demoted and constructively discharged Ms. Calobrisi. Defendant maintains that Mr. Appleby made the decision. (Def. Mem. at 19-20.) However, Mr. Osborne testified that it was a "consensus decision" and in August 2010, he spearheaded a "value model" for the LD that expressly considered "law dept demographics," and "age distribution." (SMF ¶9.) Contemporaneous documents show that on January 14, 2011, Mr. Osborne (not Mr. Appleby) wanted to take a "fresh look" at the practice groups to discuss the "composition and leadership of the core teams." (SMF ¶10.) Mr. Appleby testified that as early as June 2010 (at least six months prior to Ms. Calobrisi's demotion), Mr. Osborne had the authority to make future staffing decisions. (SMF at ¶9.) Moreover, the inference articulated in *Proud* only applies where "the hirer and the firer are the same individual <u>and</u> the termination of employment occurs within a relatively short time span following the hiring. . . ." 945 F.2d at 797. That is not true here as Ms. Calobrisi was hired 11 years prior to her demotion. (SMF ¶1.)

---

[3]     Defendant appears to also assert that Mr. Appleby, as a "decision maker," cannot discriminate because he is older than Ms. Calobrisi. (Def.'s Mem. at 19, n.4.) However, Mr. Appleby is *not* in the same protected class as Ms. Calobrisi because he is a male, and there is a genuine issue of fact whether Mr. Appleby was actually the decision maker.

**B.      The Demotion Was an Adverse Employment Action**

The record reveals that Ms. Calobrisi was demoted (SMF ¶11-13), yet Defendant asserts

otherwise. (Def.'s Mem. ¶13.) Plaintiff suffered an adverse employment action when she was

demoted. *See Dugan*, 293 F.3d at 720 (a demotion is an adverse employment action); *Dea v. Wash.*

*Suburban Sanitary Comm'n*, 11 Fed. Appx. 352, 363-364 (4th Cir. 2001) (same). The Talking

Points clearly refer to Ms. Calobrisi's demotion as such ("Why am I being asked to accept a

demotion?" "What if I refuse to accept the demotion?") (SMF ¶11.) A reasonable jury could reject

Booz Allen's after-the-fact explanation that Ms. Calobrisi's position was "rescoped," in contrast

to the contemporaneous Talking Points referring to the action as a demotion. (*Id*.) "A prima facie

case coupled with probative evidence 'that the employer's explanation is false,' would counsel

against granting the employer summary judgment." *Dennis v. Columbia Colleton Med. Ctr., Inc.*,

290 F.3d 639, 651 (quoting *Reeves*, 530 U.S. at 149). Ms. Calobrisi's demotion was by no means

voluntary. (SMF ¶11-13, 16-18.) Defendant's insistence that it encouraged her to continue on as a

Sr. Associate rings hollow in the face of the evidence that they wanted her to [REDACTED] and

[REDACTED] "demote or leave." (SMF ¶17-18.) Defendant concedes that the demotion was an

adverse employment action. (Def.'s Mem. at 21, n.6.)

**C.      The Circumstances Give Rise to an Inference of Unlawful Discrimination**

A reasonable jury could find that Booz Allen's decision to demote Ms. Calobrisi and take

away her work occurred "under circumstances giving rise to an inference of unlawful

discrimination." Messrs. Osborne, Meyers, Manya, and members of the Booz Allen Leadership

Team, including Mr. Strickland and Mr. Rozanski, participated in discussions at least as early as

October 22, 2010, where they decided explicitly that [REDACTED]. (SMF ¶5.) Nevertheless, in

December 2010, Mr. Meyers assigned Ms. Calobrisi the leadership role within the LD for the firm's expanded international work and assigned her to be the LD's international representative on the X-Team. (SMF ¶6.) Mr. Meyers misled Ms. Calobrisi, telling her in December 2010 it would be her "time to shine." (*Id*.) Booz Allen misled Ms. Calobrisi about her role through December and into January, encouraging her to participate in the international working group. (*Id*.) All the while, Messrs. Osborne, Meyers, and Manya knew that Ms. Calobrisi would "not be the person" to drive that business. (SMF ¶6.) Confronted with litigation, Defendant now claims that Mr. Appleby alone made the decision to demote Ms. Calobrisi. The 4th Circuit has relied on "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Dennis*, 290 F.3d at 648; *Reeves*, 530 U.S. at 147. "A prima facie case coupled with probative evidence 'that the employer's explanation is false,' counsels against granting the employer summary judgment." *Id*. at 651.

Furthermore, contrary to Defendant's assertion, comparator evidence is not "the final answer in discrimination law . . . it of course remains the case that <u>a plaintiff is 'not required as a matter of law to point to a similarly situated . . . comparator in order to succeed' on a discrimination claim</u>." *Laing v. Fed. Express Corp*., 703 F.3d 713, 720-21 (4th Cir. 2013) (quoting *Bryant v. Aiken Reg'l Med. Ctrs., Inc*., 333 F.3d 536, 545 (4th Cir. 2003)). "There is no requirement that a similarly-situated comparator hold a plaintiff's identical position." *Bateman v. Am. Airlines, Inc.,* 614 F. Supp. 2d 660, 674-75 (E.D. Va. 2009). Even if Ms. Calobrisi were required to demonstrate comparator evidence, which she is not, she can readily show that similarly-situated younger women and similarly-situated men were treated more favorably than she. The proper comparators would be Mses. Tinsky (age 36) and Storms (age 46), and Messrs. Meyers (age 43) and Manya (age 43). (SMF ¶13.) The fact that Mses. Tinsky and Storms were both given Ms. Calobrisi's work

only lends support to the inference that Booz Allen discriminates against older women. (Def. Mem. at 20-24.) Mses. Tinsky and Storms are "substantially younger" than Ms. Calobrisi. *See Masterson v. AAAA Self Storage Mgmt. Group LLC*, 2014 U.S. Dist. LEXIS 6476, *19, n.3 (E.D. Va. Jan. 17, 2014) (burden of showing "substantially younger" satisfied where plaintiff was replaced by person nine years younger). The fact that Mses. Tinsky and Storms are women does not lessen the inference that Booz Allen discriminated against Ms. Calobrisi because she is an *older* woman. Women and older women are not exact comparators because they do not belong entirely to the same protected category, and in any event "[m]erely because other members of a protected class . . . were [treated favorably] does not demonstrate an absence of discrimination." *Conn. v. Teal*, 457 U.S. 440, 141-143 (1982)(citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)). Messrs. Meyers and Manya are younger men who were treated more favorably than Ms. Calobrisi because Booz Allen paid them higher salaries and bonuses, provided them with expanded teams of attorneys to support their work, and promoted them more quickly than Ms. Calobrisi, despite the fact that Ms. Calobrisi was significantly more experienced. (SMF ¶7.) Despite Ms. Calobrisi's Team Lead status, her requests for additional attorneys to work with her were denied, whereas both Messrs. Manya and Meyers had at least four attorneys working for them. (*Id.*) This evidence supports an inference of discrimination and a jury could find that Ms. Calobrisi has shown a prima facie case of sex and age discrimination.

### D.      Booz Allen's Proffered Reason for Demoting Ms. Calobrisi is Pretext

Booz Allen's proffered reason to demote Ms. Calobrisi simply falls apart in the face of overwhelming evidence of pretext in this case. A reasonable jury could certainly conclude that Booz Allen has fabricated reasons for its decision to demote Ms. Calobrisi. Defendant asserts that its "legitimate, non-discriminatory reason" for demoting Ms. Calobrisi is that it restructured the

LD to "bring[] the position in line with the other two practice leads already slotted as Senior Associates." (Def.'s Mem. at 23.) Until filing this motion, Defendant has consistently maintained that Ms. Calobrisi was demoted for a different reason – namely that given the expectation for expanded growth in international and commercial, handling all three practice areas would be "too much" for one attorney. (Ex. 7, Meyers 2 Tr. 153:5-8; Ex. 23, 30(b)(6) Tr. 27:5-10; Ex. 9, Appleby 2 Tr. 27:8-19.) However, upon realizing that this fails to explain why Ms. Calobrisi could not have handled the work with attorneys staffed to support her (because it conceded from the start that the decision was "not about [her] performance"), Booz Allen shifted its proffered reason. (SMF ¶11.) These shifting reasons strongly suggest pretext. *See Dennis*, 290 F.3d at 647 (citing *EEOC v. Sears Roebuck*, 243 F.3d 846, 852-53 (4th Cir. 2001) (inconsistent post-hoc explanations for employment decisions are probative of pretext).

### E.     The Evidence of Booz Allen's Discriminatory Corporate Culture Toward Older Women Demonstrates Pretext

"Evidence of a pattern or practice of discrimination [in an individual case is] useful and relevant to prove . . . that the employer's articulated reasons for the adverse action was merely pretext." *See Gilyard v. Northlake Foods, Inc.*, 367 F. Supp. 2d 1008, 1015 (E.D. Va. 2005)(citing *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 758-759 (4th Cir. 1998). "Evidence of a general atmosphere of discrimination may be considered" to show pretext. *Holsey v. Armour & Co.*, 743 F.2d 199, 207-208 (4th Cir. 1984). Corporate culture, like the one at Booz Allen, is important to show a pattern and practice and a generalized atmosphere of discrimination. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) (summary judgment inappropriate where a "corporate culture" of discriminatory animus could be attributed to the employer). "Plaintiff's 'powerful evidence showing a discriminatory attitude at [her company] toward female managers' [was] sufficient to 'allow a trier of fact to conclude that these discriminatory attitudes

led to [plaintiff's] ultimate termination.'" *Id.* (quoting *Lettieri*, 478 F.3d at 649). Testimony of individuals in the same protected category can demonstrate a consensus that there is a glass ceiling and support a showing of pretext. *Christmas v. N.C. Dep't of Admin.*, 2011 U.S. Dist. LEXIS 52300, *25 (E.D.N.C. May 16, 2011).

A reasonable jury could certainly find, based on evidence *that was unrebutted throughout discovery*, there is a pattern and practice of sex and age discrimination against older women at Booz Allen. The evidence – testimony of similarly-situated, top-performing women (Joan Hyde, Elizabeth Ewart, Molly Finn, Catherine Nelson, Diane Merolla, Deborah Sherman, and Robin Shaffert, as well as evidence of at least eight other similarly-situated women) who were all marginalized and then pushed out of the firm once they reached a certain age and career level – shows that there is a pattern and practice and corporate culture of sex and age discrimination that acts as a glass ceiling for older women within Booz Allen's LD, the Global Operations ("GO") Team that it supported, and others. (Ex. 54, Assessments.)

Ms. Hyde was a Vice President in charge of the Contracts Department when Booz Allen abruptly demoted her at age 56 after 20 years with the company. (Ex. 39, Hyde Tr. 10:2-5; 11:6-12:2; 40:17-41:14; 69:19-70:7.) Her supervisor told her that she was being stripped of her job duties because "several people who were working for [her] didn't like working for [her]." (*Id.* 10:20-22, 14:19-20.) She testified that several other older women who, like her, had achieved a certain level of success, such as "Molly Finn, Margo Fitzpatrick, Catherine Nelson, Robin Shaffert, Carla Calobrisi," "were let go, allowed to resign, were either demoted or marginalized [and] made me feel that what happened to me was not unusual." (*Id.* 37:13-38:13, 66:9-68:4.) Ms. Hyde went into great detail about how each of these older women were subjected to discriminatory treatment and eventually terminated, demoted, marginalized, or otherwise pushed out of their jobs because

of their age, gender, and career level. (*Id.* 68-83.) Ms. Hyde testified that, like Ms. Calobrisi, she framed her departure as a retirement because she was humiliated, marginalized, undermined, had all of her work taken from her after achieving significant success at Booz Allen, and in light of all that, "couldn't be successful at Booz Allen." (*Id.* 40:17-41:14; 69:19-70:16.)

Similarly, Ms. Ewart testified that after 35 years (20 years as a Sr. Associate) in the Booz Allen real estate and facilities group, she was not promoted despite her excellent annual assessments and the fact that a Principal position, recently vacated by a man, had opened up and she had taken over all the responsibilities of the position. (Ex. 55, Ewart Tr. 9:17-10:4, 17:18-22, 54:3-18, 59:19-63:5; 80:5-81:9.) She was in her early to mid-50s at the time. (*Id.* 94:2-6.) She further testified that "there was a pattern in the GO team in my particular organization of not promoting women into positions vacated for one reason or another by a male director." (*Id.* 58:7-10.) She stated that all four of the other Sr. Associate women in her organization, Chimisa Walker, Sheryl Jones, Eileen Kabay, and Velma Booth also were not promoted, despite the fact that a Principal position had recently been vacated by a man and they had taken over all the responsibilities of the Principal position. (*Id.* 59:4-64:16.) They were all in their 40's or 50's when those decisions were made. (*Id.* 93:3.) When the women raised this with their supervisor, suggesting that "gender was a factor," he became red in the face, irritated, and changed the subject. (*Id.* 88:17-90:20.)

Ms. Finn stated that the older women who are successful and in an upward trajectory at Booz Allen "are in trouble," and are targets for termination or being forced out of the firm. (*See* Ex. 56, Finn Tr. 90:15-93:15.) Concerning this issue, she stated "we all know Booz Allen has this problem." (*Id.* 86:5-6.) Ms. Finn further testified that Booz Allen "kept knocking off the top

partner. First it was Joyce [Doria][4], then it was Heather [Burns], then at some point there DeAnne Aguirre got demoted after she raised the women's issue.[5] She was a top senior woman." (*Id.* 93:7-11.) Regardless of their suitability to join the Leadership Team, women at the top never seemed to have "the right personality," even though men on the Leadership Team could be "extremely aggressive verbally," women like Joyce Doria and DeAnne Aguirre were rejected for leadership because they were nonetheless regarded as "too aggressive." (*Id.* 94:20-97:14; 101:6-16; 102:14-103:18.) Ms. Finn further testified that Booz Allen's treatment of Ms. Hyde is "consistent" with "women getting their jobs taken away from them and then fired." (*Id.* 106:8-107:5.) Ms. Finn became a partner after she captured and grew business worth $40 million in revenue with 200 personnel, only to have that business abruptly taken away and given to a younger, "a lot less" experienced woman and two men she had "either helped promote or brought in." (*Id.* 11:11-14:10, 12:12-13:8, 21:21-22:8; 36:21-38:13; 41:17-42:22; 47:21-48:2.) Booz Allen did not give her any support for her new business, and then fired her at age 46. (*Id.*; 10:2-14 45:11-46:20, 64.) She was fired when two other male partners had significant performance issues, but were not fired. (*Id.*)

Ms. Nelson testified that after 9 years at Booz Allen and after rising to the Partner level in Booz Allen's Economic and Business Analysis group, her $400 million business was unexpectedly taken away from her and she was asked to leave Booz Allen in 2011. (Ex. 57, Nelson Tr. 9:14, 15:21-16:2, 21:17-25:21, 26:18-21, 27:13-28:10, 31:11-33:13.) She was in her 40s. (*Id.* 10.)

Ms. Merolla testified that she was Mr. Appleby's "right-hand man for all of the administrative functions within the department." (Ex. 58, Merolla Tr. 12:14-16.) Like other older

---

[4]    Ms. Calobrisi was present when Messrs. Appleby and Shrader halted Ms. Doria's election to president of the technology business when it became apparent that she was going to win. (Ex. 11, Cal. Ans. to Interrogs. at 5-6.) Mr. Dennis Doughty was appointed shortly thereafter. *Id.*

[5]    DeAnne Aguirre complained to leaders at Booz Allen that "we have a problem with women not being put into formal leadership positions." (Ex. 56, Finn Tr. 98:13-17.)

women, her job responsibilities were taken away from her even though she received the highest performance rating for at least five years prior. (*Id.* 12:20-14:22.) Her final rating was downgraded when she was fired. (*See* Ex. 59, CC 001798-1804.) Despite 34 years in the LD, she was never promoted. (Ex. 58, Merolla Tr.  15:18-21.) At age 62, during her 2010 assessment, she was abruptly fired and told that "the department was going in another direction." (*Id.*16:14-18; 18:13-21, 24:19-25:8.) Yet, her assessment reveals that she was fired for having a "strong tether to the past," and because "adapting has been challenging." (Ex. 59, CC 001798-1804 at 1803.) Instead of "embracing" the new, she "became reticent" and "entrenched in doing things the way they had been done before." (*Id.*) It stated that she "will need to accept that change is inevitable," and "there is insufficient activity to maintain the role going forward." (*Id.*) Mr. Appleby told her "you should be thinking about retiring." (Ex. 58, Merolla Tr. 25:20-26:15.)

Similarly, Ms. Sherman testified that after 10 years as a Principal in the LD, 16 years of relevant experience, and "outstanding," "consistently high-quality work," she was never promoted. (Ex. 60, Sherman Tr. 10:8-12:3, 55:7-56:13.) She left Booz Allen at age 44 to join Booz and Co. after the 2008 split, only because she "had no choice." (*Id.*16:19-21, 21:18-22:9.) She testified that Andreas Krumpholz, with Booz Allen half as long as she, was promoted to Principal before her. (*Id.* 49:9-22, 52:12-22.) She thought her work on the Booz Allen spin off justified a promotion but was informed that Mr. Krumpholz was promoted "because he asked," (*Id.* 45:2-20, 49:9-50:3) and she was not promoted because "she never asked." (*Id.* 49:9-51:12) However, Mr. Meyers, also in the LD, testified that he "wouldn't have been able to get – initiate a promotion for [him]self" and that he is "not the type that would have specifically asked for it." (Ex. 7, Meyers 2 Tr. 18:11-19:16.) Nonetheless, he was promoted. (*Id.* 15:2-10.)

Ms. Shaffert testified that she reached the highest level in the LD after Mr. Appleby – she

was the LD Deputy General Counsel and Senior Director before Mr. Meyers held that role. (Ex. 61, Shaffert Tr. 15:7-19) Despite "very positive" annual assessments, Mr. Appleby did not support her in her role and instead abruptly took away her management responsibilities, essentially eliminating her role entirely. (*Id.* 10:6-11:4, 23:18-26:21, 36:4-8.) Similarly, Mr. Appleby did not vouch for Ms. Calobrisi, but supported Messrs. Meyers and Manya when he protected them, telling Mr. Osborne that these men "had [his] continued strong support as the Number 1 and 2." (Ex. 27, Appleby 1 Tr. 47:21-48:11.) Ms. Shaffert worked in the LD for over 12 years and was 45 years of age when her management responsibilities were taken from her. (Ex. 61, Shaffert Tr. 6:22-7:1, 17:9-10.) Like Ms. Hyde, she was told that people who were working for her did not want her in that role. (*Id.* 23:18-26:21, 36:4-8.) Before her work was taken, Ms. Shaffert's mentor, Sr. Vice President Joe Garner, had told Mr. Appleby that if he took away Ms. Shaffert's job responsibilities, she would quit. (*Id.* 46.) Ms. Shaffert resigned shortly after she was stripped of her job responsibilities. (*Id.* 39:18-20.) Ms. Shaffert recounted that Mr. Shrader did not like her because she once "spoke too aggressively to Mr. Strickland." (*Id.* 43:3-47:12.) Defendant's counsel barred her from testifying as to aggressive conversations between men at Booz Allen. (*Id.*)

Evidence of discrimination against employees based on the same protected trait, which Ms. Calobrisi amply shows here, is probative of unlawful discrimination. The 4th Circuit has acknowledged that the "elusive factual question of intentional discrimination is inevitably tough and rarely clear cut." *Merritt*, 601 F.3d at 301. However, "[e]vidence of a good employee record combine[d] with evidence of an impermissible company attitude [] form[s] a lethal concoction." *Id.* Disposition of Ms. Calobrisi's claims at the summary judgment stage would "'intrude on the jury function by substituting [the court's] own judgment for that of the finder of fact.'" *Id.*(quoting *Dennis*, 290 F.3d at 650). A reasonable jury could certainly find that the testimony of these women

shows pretext because it shows a pattern and practice and corporate culture of age and gender discrimination within Booz Allen's LD and the Global Operations Team that it supported.

## II.   PLAINTIFF PROVIDES SUFFICIENT EVIDENCE FROM WHICH A JURY COULD REASONABLY CONCLUDE THAT DEFENDANT RETALIATED

### A.   Ms. Calobrisi Engaged in Protected Activity when She Repeatedly Complained of Sex and Age Discrimination

Ms. Calobrisi engaged in protected activity when she complained of sex and age discrimination to Mses. Thompson and Gleich and Mr. Meyers. (SMF ¶15, 18.) Raising the issue with these three was consistent with Booz Allen's policies and Defendant's insistence that Ms. Calobrisi had to formally request an investigation[6] is of no moment. *See Lettieri*, 478 F.3d at 643 (plaintiff did not request investigation and none was done). Ms. Calobrisi reasonably believed that Booz Allen demoted her due to her sex and age because her work was diverted to younger attorneys and her marginalization was "typical" based on her observations of Booz Allen's discriminatory treatment of other older women. (SMF ¶15; *see* Sec. E, *supra*.) *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-407 (4th Cir. 2005) (protected activity includes not only "employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful."). A reasonable jury could conclude that Ms. Calobrisi engaged in protected activity when she complained.

### B.   The Evidence Demonstrates that Booz Allen Retaliated Against Ms. Calobrisi for Engaging in Protected Activity

The opening sentence of Defendant's motion now rests on the false claim that Ms. Calobrisi

---

[6]   Defendant's reference to the "*Faragher/Ellerth* defense" (Def.'s Mem. at 30) is wholly unrelated to the claims and defenses in this case. Booz Allen has not asserted this affirmative defense and has waived it. *See Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 612 (4th Cir. 1999). This defense applies to hostile work environment claims, which Plaintiff does not claim. This section of Defendant's brief should not be considered. (**Dispute D's SOF ¶ 36.**)

"voluntarily resigned." (Def. Mem. at 2.) After Ms. Calobrisi complained to Ms. Thompson, Booz Allen insisted, just days later, that the letter formalizing her demotion include the false statement that she "approve[d] and voluntarily accept[ed] the demotion. (SMF ¶16.) "Very little evidence of a causal connection is required to establish a prima facie case [of retaliation]." *Burgess*, 466 Fed. App'x. at 283. "Temporal proximity between the protected activity and the employer's adverse action alone will suffice." *Id*. The temporal proximity between Ms. Calobrisi's complaint to Ms. Thompson and forcing her to create a false record of the "voluntariness" of her demotion alone could lead a reasonable jury to conclude that she has shown a causal connection. In any event, Defendant's argument is unsupported because Ms. Wilkie's email purportedly showing the firm's "general practice" (Ex. A) was not filed with the Court (Def. Mem. at 27, Def. Ex. 25), and in discovery, Defendant never identified Ms. Wilkie as a witness with knowledge to support this "defense," thus her declaration is not proper.

Additionally, evidence of recurring retaliatory animus between the protected activity and retaliatory conduct can satisfy the element of causation. *Lettieri*, 478 F.3d at 650. Evidence of recurring retaliatory animus in the period between Ms. Calobrisi's complaints and constructive discharge includes the following: Shortly after complaining to Mr. Meyers and Ms. Gleich, Ms. Calobrisi was told, as reflected in emails, to [REDACTED] "demote or leave." (SMF ¶17-18.) She was repeatedly questioned about whether she would leave and the message ("demote or leave") never wavered. (*Id*.) If Ms. Calobrisi tried to talk to someone about her concerns, she was told to get over it and accept it. (*Id*.) She was mocked for her participation on the Diverse Women's Mentoring Circle. (SMF ¶15.) She had little, if any, remaining work, she had no staff, and her reputation had been destroyed. (SMF ¶14, 20.)

### C.       Booz Allen Constructively Discharged Ms. Calobrisi

There is a genuine issue of material fact whether Booz Allen constructively discharged Ms. Calobrisi. A constructive discharge claim consists of: (1) deliberateness of the employer's action and (2) intolerability of the working conditions. *Martin v. Cavalier Hotel Corp*., 48 F.3d 1343, 1353-54 (4th Cir. 1995). It is the "mandated approach" in this Circuit to "permit a plaintiff to prove her employer's intent [deliberateness] by demonstrating that her resignation was the reasonably foreseeable consequence of the employer's conduct." *Id*. at 1355-56. "When an employer denies a conscious effort to force an employee to resign [like Mr. Meyers did here]. . . the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions." *Id.*

The deliberateness of Booz Allen's conduct is evident in several ways. Messrs. Osborne, Meyers, and Manya, and Appleby deliberately misled Ms. Calobrisi when (having already decided in October 2010 that she would not lead the commercial and international work) they assigned her to be the LD representative to the firm in preparation for the re-entry into that work. (SMF ¶5-6.) Mr. Meyers misled her again when he told her the coming period would be "her time to shine." (*Id*.) The group misled her when they staged the January 26, 2011 demotion meeting where she arrived with her file showing all the work she had done for the past six months, only to be told she would be demoted. (SMF ¶11-12.) The Talking Points amply demonstrate that they foresaw that the demotion from Principal to Sr. Associate would give rise to intolerable working conditions for Ms. Calobrisi. (*Id*.) They correctly foresaw her utter humiliation and plotted written responses to each question, preparing to lie to her about the false reason for the decision and later masking the action with euphemisms like "rescoping," "downslotting," and "transfer," saying her demotion was "not a choice" and she could "transition out." (*Id*.) The *Martin* court found this exact circumstance to constitute constructive discharge. *See* 48 F.3d at 1357 ("when [plaintiff] cried,

[defendant] told her to succumb or be fired"). Also, when an employer fails to remedy a discrimination complaint it is sufficient to show deliberateness. *Vitello*, 1997 U.S. App. LEXIS 3728, *14 (upholding jury verdict for plaintiff on ADEA and constructive discharge claims).

Ms. Calobrisi's working conditions were intolerable. "Demoting an employee can constitute an unreasonably harsh [and intolerable] condition of employment, especially where the demotion is essentially a career-ending action or a harbinger of dismissal." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). Mr. Appleby told her the demotion was the first in a two-step process, suggesting she would ultimately be fired. (SMF ¶13-14.) "The combination of the demotion, the continuing limitations on [] salary and responsibility, and [her boss's] repeatedly asking [] whether [s]he was going to quit h[er] job, could make working conditions intolerable for a reasonable person." *Vitello v. J.C. Penney Co*., 1997 U.S. App. LEXIS 3728, *15-17 (4th Cir. Mar. 3, 1997). Ms. Calobrisi was demoted and her salary was effectively reduced. (SMF ¶12.) Her reputation was destroyed and her work taken away, and Mr. Meyers and others continually questioned her whether she would "demote or leave." (SMF ¶17-20.) From the cusp of expanding Booz Allen's global footprint and the chance to become Vice President, they relegated her to the Sr. Associate position she had held 8 years earlier, and she would now be in a humiliating support role to her previous subordinates. (SMF ¶12.) The sum of these actions was career-ending. (*Id*.) A reasonable jury could conclude that Ms. Calobrisi's has shown a prima facie case of retaliation.

## CONCLUSION

For the foregoing reasons, Plaintiff Carla Calobrisi respectfully requests that this Court deny Defendant's Motion for Summary Judgment. (Doc. No. 255.)

Respectfully Submitted,

  */s/ John R. Ates*
John R. Ates, Esquire (VSB # 71697)

Ates Law Firm, P.C.
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 647-7501 (telephone)
(703) 229-6430 (facsimile)
j.ates@ateslaw.com

  /s/ *Linda M. Correia*
Linda M. Correia
(*Admitted pro hac vice*)
Amber Trzinski Fox
(*Admitted pro hac vice*)
Correia & Puth, PLLC
1775 K Street, NW, Suite 600
Washington, D.C. 20006
Telephone: (202) 602-6500
Facsimile: (202) 602-6501
lcorreia@correiaputh.com
afox@correiaputh.com

Attorneys for Plaintiff Carla Calobrisi

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 9, 2015, I served the foregoing through the Court's electronic filing system to the following, which will then send a notification of such filing ("NEF") to counsel identified below:

Stephen W. Robinson
Sarah A. Belger
Melissa L. Taylormoore
McGuire Woods LLP
1750 Tysons Blvd., Suite 1800
Tysons Corner, VA 22102
srobinson@mcguirewoods.com
sbelger@mcguirewoods.com
mtaylormoore@mcguirewoods.com


Attorneys for Defendant


   */s/ John R. Ates*
John R. Ates, Esquire (VSB # 71697)
Ates Law Firm, P.C.
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 647-7501 (telephone)
(703) 229-6430 (facsimile)
j.ates@ateslaw.com