IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CARLA CALOBRISI,                    )
                                    )
            Plaintiff,              )
                                    )
v.                                  )     Civil Action No. 1:14-cv-00996 (AJT/MSN)
                                    )
BOOZ ALLEN HAMILTON, INC.,          )
                                    )
            Defendant.              )

## MEMORANDUM OPINION

Defendant Booz Allen Hamilton, Inc. ("Booz Allen" or Defendant) has moved for

summary judgment in this age and sex discrimination case ("the Motion). The dispositive issue is

whether Plaintiff Carla Calobrisi ("Calobrisi" or Plaintiff) has presented evidence sufficient to

allow a reasonable fact finder to conclude that Defendant's restructuring of its Law Department,

under which Plaintiff was demoted from Principal to Senior Associate, was a pretext for age and

sex discrimination leveled against her.  Having reviewed the summary judgment record, the

Court concludes that the evidence is insufficient, as a matter of law, for a reasonable juror to find

that Defendant's restructuring of its Law Department was a pretext for discriminating against the

Plaintiff; and Plaintiff has therefore failed as a matter of law to rebut Defendant's legitimate non-

discriminatory explanation for her treatment. For these reasons and those stated more fully

below, the Court finds that there are no genuine issues of material fact and Defendant is entitled

to judgment as a matter of law.  Defendant's Motion for Summary Judgment [Doc. No. 255] is

therefore GRANTED.

1

## I. FACTS[1]

Plaintiff was hired on April 10, 2000 as a Senior Associate and Associate General Counsel in Booz Allen's Legal Department (LD). At the time she was hired, she had practiced law for approximately fourteen years. In 2003, Plaintiff was promoted to Principal. In 2008, Booz Allen spun off its commercial and international business as part of a transaction with the Carlyle Group. That transaction included a non-competition agreement under which Booz Allen agreed not to compete in the commercial and international areas until July, 2011. In 2009, following the transaction with the Carlyle Group, Booz Allen consolidated under Plaintiff the limited legal work that remained in the commercial and international business practices with the legal work in the real estate area she had been doing since joining Booz Allen. As before this consolidation, Plaintiff did not supervise other lawyers.[2]

During the three years covered by the non-compete agreement, Deputy General Counsel William Meyers and then-General Counsel Appleby assured Plaintiff that when the non-compete period ended on July 30, 2011, her work in the commercial and international practices would expand. On one occasion, Meyers told Plaintiff that it was going to be her "time to shine" because her practice was about to significantly expand due to the expiration of the non-compete agreement.

---

[1] These facts are drawn from the undisputed facts, as they appear in the parties' briefs, with all reasonable inferences drawn in plaintiff's favor and any disputed issues of fact viewed most favorably to the plaintiff.

[2] The record is unclear how work in the commercial and international areas was assigned during the non-competition period since the two lawyers who were later selected as team leaders for the commercial and international practice areas worked on such matters under the supervision of Deputy General Counsel Meyers and Manya, not Plaintiff.

In January, 2010, Appleby announced his retirement, effective July 2011, and Robert

Osborne was selected to become General Counsel. Unbeknownst to Plaintiff, by the end of 2010,

the LD "leadership team," including Appleby, Meyers, incoming General Counsel Robert

Osborne, and Deputy General Counsel Douglas Manya, was contemplating a restructuring of the

LD in anticipation of Booz Allen's reentry into the commercial and international markets in July

2011. On January 20, 2011, Messers Appleby, Meyers, Osborne, and Manya met and finalized

that restructuring. Under the restructuring, as adopted and insofar relevant to this litigation, the

real estate, commercial and international practices would no longer be consolidated under one

team leader but rather would be split into three separate teams with a lawyer at the Senior

Associate level leading each team, with all team leaders reporting to the Deputy General

Counsels. Plaintiff, then age 55, was selected to be the team leader for global real estate work,

with her status reduced effective April, 2011, from Principal to Senior Associate; and while her

salary would not be reduced and she would remain eligible for a Principal-level bonus in 2011,

she would thereafter be limited to the benefits provided at the Senior Associate level. Debra

Storms, age 46, was selected to be team leader for commercial work and Karen Tinsky, age 36,

for international work. At the time, both Storms and Tinsky were Senior Associates reporting to

Deputy General Counsels Meyers and Manya and they retained their Senior Associate status. On

January 26, 2011, Appleby, Osborne, and Meyers informed Plaintiff about the LD restructuring

and her new position and status. [3]

---

[3] Plaintiff claims there is a factual dispute concerning who made the ultimate decision to restructure the LD and to demote Plaintiff. According to Defendant, Appleby was the sole decision-maker. Doc. No. 256 at ¶¶ 10-11. Plaintiff contends that Osborne was the primary proponent of the plan to restructure the LD, that Osborne told Plaintiff that he had decided to

On March 24, 2011, Plaintiff contacted Chief Personnel Officer Betty Thompson to discuss her concerns with her demotion, and specifically, whether she was demoted because of her gender or age. Plaintiff also raised whether she would be able to continue serving on the diverse women's mentoring circle now that she would no longer be a Principal. Plaintiff did not ask Thompson to conduct an investigation into her demotion, but had the expectation that Thompson would initiate one on her own. Not long after raising her concerns with Thompson, Meyers and HR Manager Caroline Wilkie requested that Plaintiff sign a memorandum stating "I acknowledge that I have read this memo and approve and voluntarily accept the terms and conditions of the aforementioned transfer [from your current position as a Principal to the position of Senior Associate effective April 1, 2011]."

At Plaintiff's annual assessment in May 2011, Plaintiff's peer assessor, Jennifer Gleich, together with Meyers, meet with the Plaintiff to present to her the results of her annual performance review and to discuss what Plaintiff should focus on for upcoming year. The conversation turned to Plaintiff's concern that her demotion was the result of gender and age discrimination. At that meeting, as Plaintiff remembers it, Meyers told Plaintiff that if she could not "get over it," (meaning, the demotion) then she could leave the firm and he discussed a package to transition her out of the firm. Meyers' message to Plaintiff was consistent with

---

demote her, and that the decision to demote her was a "consensus" decision of Appleby, Osborne, Meyers and Manya. Doc. No. 261 at ¶¶ 9-10. Read as a whole, the record reflects that Appleby made the decision to restructure the LD and have Plaintiff serve as team leader for only Global Real Estate. Nevertheless, the Court has assumed for the purposes of the Motion that there exists a genuine issue of fact concerning who were the relevant decision makers, but finds that dispute immaterial to the Court's analysis and decision.

emails that Meyers and Gleich exchanged before the meeting regarding the message to be delivered to Plaintiff.

In June 2011, Plaintiff announced her intention to retire and resign from the firm, effective October 31, 2011.[4] She agreed to participate in the selection of her replacement and she, in fact, interviewed candidates. On September 9, 2011, the firm hired the candidate that Plaintiff had recommended as her replacement, an African American male, with a starting salary of $75,000 less than Plaintiff's base compensation.

On May 31, 2013, Plaintiff filed her Complaint which asserted the following causes of action: (1) Sex Discrimination in violation of the District of Columbia Human Rights Act, D.C. Code §§ 2-1402.11 *et seq.* (DC HRA); (2) Sex Discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1); (3) Discrimination on the Basis of Age in violation of the DC HRA; (4) Discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1) (ADEA); (5) Retaliation in violation of the DC HRA; (6) Retaliation in violation of Title VII of the Civil Rights Act; and (7) Retaliation in violation of the ADEA.[5]

---

[4] There is a factual dispute concerning whether it was Plaintiff or Meyers who first referred to her separation from Booz Allen as a "retirement," with Plaintiff contending that Meyers was first to use the phrase and that Plaintiff adopted the characterization "to maintain her dignity."

[5] Plaintiff originally filed her Complaint in the Superior Court for the District of Columbia. On June 24, 2013, Booz Allen removed the case to United States District Court of the District of Columbia pursuant to 28 U.S.C. §§ 1441 and 1446. On July 23, 2014, U.S. District Court for the District of Columbia dismissed Plaintiff's claims under the DC HRA and transferred the case to this Court because most of the alleged discriminatory actions occurred in McLean, Virginia where Plaintiff had worked. Prior to that ruling, the court had granted Plaintiff's motion for limited discovery on the jurisdictional and venue issue. Discovery concluded in December 2014, and Defendant filed the pending motion on January 23, 2015.

Plaintiff seeks reinstatement, back pay, front pay, compensatory damages, punitive damages, litigation costs, and interest.

## II. LEGAL STANDARD

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.,* 80 F.3d 954, 958–59 (4th Cir.1996). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *see also Lettieri v. Equant Inc.,* 478 F.3d 640, 642 (4th Cir.2007). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248. Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

## III. ANALYSIS

*Discrimination Claims*

Title VII makes it unlawful for an employer to discriminate against an individual on the

basis of sex. *See* 42 U.S.C. § 2000e–2(a)(1). Title VII also prohibits an employer from taking an

adverse employment action against any employee "because he has opposed any practice made an

unlawful employment practice under this subchapter." 42 U.S.C. § 2000e–3(a). Likewise, the

ADEA prohibits employers from terminating an employee who is at least 40 years of age

"because of" the person's age. 29 U.S.C. §§ 623(a)(1), 631(a).

In order to survive summary judgment, plaintiff must first establish a *prima facie* case of

unlawful discrimination. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142

(2000); *Texas Dept of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). In order to

establish a *prima facie* case of discriminatory adverse employment action under Title VII or the

ADEA, a plaintiff must either produce "direct evidence" of discrimination [6] or satisfy the burden

shifting rubric established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[7] If the

plaintiff chooses to proceed under this burden shifting framework and establishes a prima facie

case, the burden of production then shifts to the employer to articulate a legitimate, non-

---

[6] Direct evidence of discrimination is "a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).

[7] To establish a *prima facie* case under *McDonnell Douglas*, a plaintiff must prove that she: "(1) is a member of a protected group; (2) applied for [the position in question]; (3) was qualified for [the position]; and (4) was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination." *Weathers v. University of North Carolina at Chapel Hill*, 447 Fed. Appx. 508, 510 (4th Cir. 2011).

discriminatory justification for its allegedly discriminatory action. *Burdine*, *supra*, 450 U.S. at

253. If the employer carries this burden, the plaintiff then must establish that the neutral reasons

offered by the employer were not its true reasons, but were a pretext for discrimination. *See*

*Burdine*, 450 U.S. at 256 ("[Plaintiff] may succeed in this either directly by persuading the court

that a discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence."). "The final pretext inquiry merges

with the ultimate burden of persuading the court that [the plaintiff] has been the victim of

intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old*

*Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (internal citations omitted). *See*

*also Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000) (a Title VII plaintiff must

prove an employer's reasons were not true or "unworthy of credence."); *EEOC v. Navy Federal*

*Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).

 Defendant concedes that Plaintiff has established a prima facie case under the *McDonnell*

*Douglas* framework as to both her age and sex discrimination claims; and Plaintiff concedes that

Defendant has articulated legitimate, non-discriminatory business reasons for its treatment of

her, specifically, its restructuring of the Law Department as part of its larger strategy to re-enter

the commercial and international markets following the expiration of the non-compete period

and in anticipation of the increased volume of legal work expected in those practice areas.

Plaintiff contends, however, that the relied upon restructuring was not the real reason for her

treatment, but merely a pretext for sex and age discrimination imposed on her. In support of this

claim, she points to two categories of evidence, either of which she claims is sufficient to raise a

reasonable inference of pretext: (1) Defendant's shifting and inconsistent explanations for why

she was demoted; and (2) circumstantial evidence that give rise to an inference of discriminatory intent, including statements reflecting discriminatory animus on the part of Booz Allen management and supervisors and, more generally, Defendant's "pattern and practice" and "corporate culture" of discrimination against older women. The Court has considered in detail these categories of proffered evidence and when considered either separately or in combination, must conclude that they are insufficient to raise a reasonable inference that Defendant's articulated reasons for its treatment of the Plaintiff were not its real reasons but rather a pretext for discriminating against Plaintiff on the basis of sex or age.

      (a) Plaintiff's claim that Defendant has offered inconsistent reasons for her treatment.

      An employer's inconsistent explanations for its employment decisions are probative of pretext. *See Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pre-text.") (quoting *EEOC v. Sears Roebuck*, 243 F.3d 846, 852-53 (4th Cir. 2001)). However, a plaintiff must point to conflicting explanations whose inconsistencies relate to the core substance of an employer's articulated justification. *See Bonds v. Leavitt,* 629 F.3d 369, 386 (4th Cir. 2011) (A Title VII plaintiff cannot establish pretext "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.")

      Plaintiff claims that Defendant's explanation of its treatment of her has shifted from one that is not based on her performance to one that is. In support of this position, she first points to Defendant's statements made at the time she was advised of her demotion that specifically disclaimed that its restructuring decisions were based on her performance, but rather the

9

expectation of expanded growth in international and commercial areas, which would make

handling all three practice areas "too much" for one attorney."[8] Plaintiff contrasts these

statements with what she claims is Defendant's current explanation that her performance was an

issue, that she was not sufficiently experienced to lead the international and commercial areas,

that the lawyers selected were more experienced in those areas, and that she was demoted in

order to "bring[] the position in line with the other two practice leads already slotted as Senior

Associates." Doc. No. 256 at p.23.

     Defendant has not engaged in the kind of shifting, inconsistent explanations that permit a

reasonable inference of pretext. Defendant has never wavered from its central justification for its

treatment of Plaintiff, viz., that as a result of its decision to re-enter the commercial and

international areas following the expiration of the non-competition period, the Law Department

was restructured to support that overall corporate strategy. There is no evidence that the reasons

given were not true or not among the core, operative considerations at the time the relevant

decisions were made. The Defendant's positions that Plaintiff now points to are inseparable

from its overall justification, part and parcel of its articulated reasons and not inconsistent with

them. In that regard, the restructuring involved creating three separate practice areas and

designating the position of team leader for each as a Senior Associates position. It was therefore

not a shift in Defendant's explanation when it claims that Plaintiff was demoted in order to bring

---

[8] She points in this regard to the draft talking points for the January 27 meeting, evidenced in
Doc. No. 261-35, Pl.'s Ex. 35, and also the statements of then General Counsel Appleby who
told Plaintiff shortly after advising her of her demotion that Storms and Tinsky were not better
lawyers than she, that she could do work in the commercial and international practice areas and
that new General Counsel Osborne "has to learn from his own mistakes." Pl.'s Dep. Tr. 207:7-
22.

her in line with the designated level for the team leader positions.  Likewise as to Defendant's criticisms of Plaintiff's performance and experience that emerged during discovery.[9]  While when pressed during discovery Defendant identified deficiencies in Plaintiff's performance over the years and her limited experience that made her ill-suited to lead all three teams, there is nothing inconsistent between the restructuring of the Law Department, a decision driven by the anticipated volume of business, and consideration of which skill sets of which employees would be best used in which positions in order to implement that restructuring.  In short, Defendant has never attempted to explain Plaintiff's treatment except based on the restructuring decisions that were made.[10]  *See, e.g.,* Osborne Dep. Tr. 50:12-51:3 (testifying how he came to the view that Plaintiff "would not be an important resource in those [i.e. commercial and international practice] areas" because of what he "saw of her work in those areas, and the limited areas she

---

[9] Defendant's criticisms of Plaintiff's performance arose in response to Plaintiff's deposition inquiries into Defendant's views on that topic generally, presumably as part of her effort to establish that Plaintiff had performed to the satisfaction of her employer, an aspect of her prima facie case that Defendant has not contested on summary judgment, and not specifically within the context of why Defendant adopted its restructuring plan.

[10] *See* Jan. 31 2014 Appleby Dep. Tr. 11:17-15:20; 19:12-18; 21:1-22 (testifying that it was determined that it would not be feasible for one attorney to oversee all three substantive areas based on magnitude of work and that Plaintiff in particular would be "way jammed up trying to do work in three areas"); Dec. 9 2014 Appleby Dep. Tr. 27:8-28:17; 49:17-51:12; 63:19; 65:5-66:7 (testifying that he concluded that one person could not handle all three matters and that Plaintiff did not have the qualifications to manage the quantity and type of commercial and international work); 30(b)(6) Tr. 36:2-18 (Meyers testifying that Plaintiff was demoted from principal to senior associate because the remaining function and work load of being the practice lead for real estate did not justify a principal level position); Osborne Dep. Tr. 88:9-89:16 (testifying that Plaintiff did not have the supervisory or substantive skill set to lead all three practice areas).

was doing it in").[11] For these reasons, this case is unlike *Dennis,* where the supervising manager's "memory of the details of the hiring process seemed to dramatically improve between deposition and trial." 290 F.3d at 647.  For the above reasons, the Court concludes that the record is insufficient, as a matter of law, to permit an inference of pretext based on any changes in Defendant's articulated justifications for her treatment.

(2) Circumstantial evidence that give rise to an inference of discriminatory intent.

Plaintiff points to what she considers evidence that her demotion occurred "under circumstances giving rise to an inference of unlawful discrimination." Doc. No. 261 at 18-19.[12] That evidence generally falls into three general categories: (1) what Plaintiff claims is her own demonstrably superior qualifications over Storms and Tinsky, as well as Meyers and Manya; (2)

---

[11] Ostensibly in support of her claim of pretext, Plaintiff also points to (1) statements in an attachment (filed under seal) to a memo dated November 18, 2010 from Caroline Wilkie to a number of people, including Osborne, Meyers and Manya (but not Appleby), pertaining to an overall talent review that had been underway for some time and which makes reference to Plaintiff's anticipated role as international business increases; and (2) statements from Meyers that once the non-competition period ended, it would be her "time to shine." Neither part of the record is sufficient to raise an inference that the restructuring was a pretext and a ruse to conceal Defendant's plan to discriminate against Plaintiff. There is nothing about the statement in the November 2010 memo that supports the inference that Plaintiff's performance was the reason for Booz Allen's restructuring of the Law Department. Similarly, no inference of pretext can be derived from Meyers' statements to Plaintiff in December, 2010 that it was going to be her "time to shine" because her practice was about to significantly expand due to the expiration of the non-compete agreement. Whatever may have been Meyers' knowledge of Plaintiff's prospects under the restructuring, or even if for whatever reason Meyers may have misled Plaintiff, this evidence does not call into question Defendant's stated reasons for its treatment of Plaintiff.

[12] While Plaintiff has presented this evidence primarily in support of her prima facie case, the Court will consider it for the purposes of plaintiff's claim of pretext as well, recognizing that "[c]ourts must ... resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non.*" *Proud v. Stone,* 945 F.2d 796, 798 (4th Cir.1991) (citation omitted).

statements from Booz Allen supervisors evidencing age and gender animus; and (3) what she refers to as "me-too" evidence that establishes a "pattern and practice" and "corporate culture" of discrimination against older women.

Plaintiff contends Defendant's decision to demote her and dis-aggregate the three practice areas lacked "any logical explanation." In support of that contention, she claims that she was better qualified to lead the commercial and international practice areas than either Storms or Tinsky, that she could have competently led all three areas if only Defendant had assigned additional attorneys to work under her supervision, as it had done for Meyers and Manya, and that an inference of pretext and discrimination can be derived from her not being selected to lead all three practice area despite her superior qualifications, as compared to Storms and Tinsky. As Plaintiff summarizes the evidence in this regard, Storms and Tinsky, women ages 9 to 19 years younger than she, were less experienced than Plaintiff in international and commercial work: Storms' capabilities centered primarily on Intellectual Property rather than commercial work, and Tinsky did not have sufficient experience in the international market. In support of her contention that she had developed significant experience in commercial and international matters, she points to her tenure as team lead for those practice areas since 2009, Appleby's favorable assessment of her talents relative to those selected, Meyers' statement to her in December 2010 that Booz Allen's re-entry into the international area would be her "time to shine" and her selection that same month to be the point of contact for International on the X-team.

In certain circumstances, pretext may be inferred from a showing that a plaintiff in a protected class was the better qualified candidate when compared to the person selected from

outside the protected class. *See, e.g., Dennis, supra,* 290 F.3d at 656 (to show pretext, a plaintiff "must establish that she was the better qualified candidate for the position sought to meet her burden of proving that the explanation is pretextual and that she was the victim of intentional discrimination.") (quoting *Evans v. Techs. App. & Serv. Co.,* 80 F.3d 954, 960 (4th Cir. 1996)). But "[i]n analyzing whether the plaintiff has met her burden of proving that she was a better qualified candidate, it is the perception of the decision maker which is relevant." *Id.* In that regard, a company's hiring decision based on an evaluation of the qualifications of competing candidates is entitled to substantial deference. *See Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 272 (4th Cir. 2005) ("We do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants.") (quoting *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998); *see also Heiko v. Colombo Savings Bank, F.S.B.,* 434 F.3d 249, 259 (4th Cir. 2006) (holding that "when a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer.").

Here, Defendant's explanation of its selection decisions to fill the positions created under its restructuring of the Law Department is entitled to substantial weight and deference. It was the result of an extended and detailed assessment of the skills and experience of the various candidates by multiple individuals, over a period of many months leading up to the implementation of the restructuring. *See, e.g.,* Pl.'s Exs. 16, 17, 18, and 19. There is no evidence that this review was based on any unlawful considerations or that Osborne, whom Plaintiff claims made the decision to demote her, thought that she was a better choice than Storms or Tinsky as team leaders in two of the three new practice areas. Plaintiff, by her own

14

description, was not an experienced government contracts or international lawyer; and the evidence is substantial that Plaintiff's experience, both before and during the time that she served as team leader for the three practice groups, pertained to real estate matters, even when her work could be characterized as falling within the commercial or international matters. Plaintiff had none of the core substantive experience that Storms and Tinsky had in the areas to which they were assigned under the restructuring, less years as practicing lawyers notwithstanding. [13] Overall, the Court sees nothing in the record that would allow a reasonable inference of discrimination or pretext based on the respective experience and qualifications of Plaintiff relative to Storms and Tinsky. Likewise, no inference of pretext or discriminatory animus can be inferred from the fact that Plaintiff had been a licensed lawyer for more years than either Meyers or Manya, that those lawyers were promoted ahead of Plaintiff, that certain lawyers were assigned to work under their supervision, that particular work assignments were made to them rather than Plaintiff or that they were compensated at higher levels based on their different positions.

---

[13] Before joining Booz Allen, Storms was responsible as General Counsel for commercial legal work for a U.S. subsidiary of a Germany company. When selected to be team leader for the commercial practice, she had been a lawyer at Booz Allen for nine years, the primary lawyer for Booz Allen's intellectual property work and the lead attorney on export matters. (Doc. No. 256 at ¶ 7). Tinsky counseled all internal Booz Allen clients on the firm's engagements with USAID, MCC, the State Department and other foreign military sales work, in addition to Foreign Corrupt Practices Act and Foreign Ownership, Control or Influence issues. (Doc. No. 256 at ¶ 8). By comparison, Plaintiff acknowledged that she was not a government contracts attorney, and not heavily involved in commercial and international markets work. (Doc. No. 256 at ¶ 9). Appleby testified that he believed that Storms and Tinsky had more experience than Plaintiff in commercial and international matters, and that the firm would not be best served by Plaintiff being the lead of commercial and international after Booz Allen's re-entry into those markets.

Plaintiff also claims that pretext may be inferred from evidence that the restructuring was motivated by a discriminatory animus based on age. She first points to the fact that while Storm and Tinsky are members of the same protected class (female) and held different job titles, they are substantially younger than she (although Tinsky is within the same protected age class). She next points to Osborne's statements at an August 2010 meeting of the LD leadership team that he was interested in creating a "value model" for the LD that considered "law dept demographics" including "age distribution," and involved hiring more junior lawyers. Pl.'s Ex. 28.[14]  She also points to what she claims was Meyers' suggestion months after her demotion that if she were to leave that her leaving be described as a "retirement."   None of this evidence is sufficient to raise a reasonable inference of discriminatory animus or that age discrimination motivated the restructuring decisions that resulted in her demotion. *See Duke v Uniroyal*, 928 F.2d 1413, 1417 (4th Cir. 1991) (in "multifaceted circumstances" such as reduction in force or restructuring contexts "the question of whether a younger employee has been retained can become murky or even irrelevant"); *see also Montgomery v. Ruxton Health Care, IX, LLC*, No. 3:06cv024, 2007 WL 1229708, at *9 (E.D. Va. April 26, 2007) ("pretext is not established by the simple fact that [the employer] once asked [the employee] about her plans for retirement.")

Finally, Plaintiff heavily relies upon what she refers to "me-too" evidence that establishes a "pattern and practice" and "corporate culture" of discrimination against older women. Plaintiff's "pattern and practice" evidence consists of testimony from seven former Booz Allen employees whom she describes as "similarly situated, top-performing women . . . who were all

---

[14] The August 2010 memo by Osborne requested "overall data for 5 years, not by individual."

16

marginalized and then pushed out of the firm once they reached a certain age and career level."

Doc. No. 261 at 22. Each of these individuals identified management decisions they or eight

other former Booz Allen employees experienced while at Booz Allen, including demotions,

terminations and lack of promotions, which they believed evidenced discrimination on the basis

of sex or age.[15] Based on this testimony, Plaintiff contends that she has proffered evidence

---

[15] Briefly summarized, that testimony is the following

- J.H. was Vice President in charge of the Contracts Department when she was "abruptly demoted" at age 56 after 20 years with the company, because her supervisor told her that several people who were working for her reported that they did not like working for her. J.H. also testified about several other older woman who, like her, were let go, allowed to resign, or were demoted or marginalized, after achieving a certain level of success. J.H. testified that she left the company voluntarily in 2011 and never experienced a title change or salary change.

- E.E. was Senior Associate for 20 years in the Real Estate and Facilities Group, and was passed over for promotion to Principal even though she had taken over all the responsibilities of the position. E.E. testified that the male director passed over other female Senior Associates in her group for promotion as well, who like E.E. were all in their 40s or 50s. E.E. testified that she had no reason to believe that age was a factor in not being promoted, and that she had no knowledge of whether any of the other female Senior Associates ever applied for a promotion. E.E. left the company in 2014.

- M.F. was a partner in the Environment Transportation and Energy Group who observed that older women on an upward trajectory "are in trouble" and are targets for being forced out. M.F. was terminated in 2011 at age 46.

- C.N. was a partner in the Economic and Business Analysis Group whose work was unexpectedly taken away from her and she was asked to leave in 2012 after nine years with the company. C.N.'s termination was part of a reduction in force among the entire partnership that affected nearly 20 partners, 15 of whom were men.

- D.M. was administrative assistant to General Counsel Appleby and worked in the LD for 34 years. D.M. was never promoted and at age 62, her rating was

sufficient to raise a triable issue of pretext and discrimination against her.  More specifically, she

claims that she has sufficient evidence to establish class wide "a pattern and practice and

corporate culture of sex and age discrimination that acts as a glass ceiling for older women,"

Doc. No. 261 at 22, and that based on that showing, a jury could reasonably conclude that

Plaintiff, as a member of the affected class, was discriminated against and that Defendant's

explanations were a pretext for discrimination. *See* Mar. 6, 2015 Tr. at 39:20-22.  In fact,

Plaintiff claims that such a showing would raise a rebuttable presumption that Plaintiff was

discriminated against as a member of that class. *Id.* at 38:7-39:5.

"Pattern and practice evidence" may establish discrimination on a class-wide basis and

when so established, an inference of discrimination may be drawn as to any member of that

class. *See Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998) *cert. granted,*

*judgment vacated*, 527 U.S. 1031, 119 S. Ct. 2388, 144 L. Ed. 2d 790 (1999) ("When the class

plaintiffs prove the existence of a discriminatory practice, then that finding benefits them in the

adjudication of individual claims by creating a presumption that the individual class members

---

downgraded. D.M. was given three months to find a position outside of the LD;
she continued to work part time in another department until December 2013 when
she decided to retire.

- D.S. was a Principal in the LD for 10 years, who left to join Booz and Co. in 2008
at the age of 44, after the companies split into two. D.S. thought her performance
at the company justified a promotion to Senior Director, whereas a male colleague
was promoted. D.S. testified that she did not know how his years of experience
compared to hers and that she did not ask for the promotion.

- R.S. was a Senior Director and Deputy General Counsel in the LD; she worked in
the LD for over 12 years and was 45 when her management responsibilities were
taken away. R.S. reported to Appleby, who, she felt, did not support her in her
role. R.S. voluntarily resigned from the company in 2007.

were victims of the discriminatory practice.") Typically, pattern and practice evidence consists of statistical proof of disparate impact within the work force, often accompanied by direct evidence of discriminatory animus on a class basis, such as statements by supervisors condoning discriminatory conduct. *See, e.g. Holsey v. Armour & Co.,* 743 F.2d 199, 214 (4th Cir. 1984). Some courts have also recognized that pattern and practice evidence may be used in a non-class action case to raise an inference of discrimination against a particular member of that case. *See, e.g. Gilyard v. Northlake Foods, Inc.,* 367 F. Supp. 2d 1008, 1015 (E.D.Va. 2005) (citing *Lowery, supra*).   Some courts have also admitted anecdotal evidence of discriminatory animus generally where there is demonstrable link to the plaintiff and her treatment. *See, e.g., Robinson v. Runyon,* 149 F.3d 507, 514 (6th Cir. 1998) (plaintiff "has connected the bogus application directly to her own work area and to one of the managers involved in the case."); *Mendelsohn v. Sprint/United Mgmt. Co.,* 402 F. App'x 337, 340 (10th Cir. 2010) ("[T]he plaintiff must demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate her. Anecdotal evidence of discrimination should only be admitted if the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand.") (internal citations omitted); *but see Sprint/United Management Company v. Mendelsohn,* 552 U.S. 379, 380 (a court has "wide discretion" to exclude under Fed. R. Civ. P. 403 "testimony by nonparties alleging discrimination at the hands of supervisors of the defendant company who played no role in the adverse employment decision challenged by the plaintiff.")

Plaintiff's use of "me-too" evidence to establish pretext goes substantially beyond any recognized jurisprudence. First, the evidence is insufficient to establish class-wide "pattern and

practice" discrimination under any recognized methodology. *See generally*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339, (1977) (where the Supreme Court recognized statistical evidence as an appropriate basis upon which to establish class-wide pattern and practice discrimination.) In that regard, Plaintiff has not proffered any of the kinds of statistical proof of disparate impact or direct evidence of discriminatory animus necessary to raise the inferences and rebuttable presumption that Plaintiff relies upon.)[16] *See, e.g., Merritt, supra,* 601 F.3d at 301(where the record included statistical evidence of disparate impact (only six female drivers in a workforce of over 3,000)). Here, with one exceptions (pertaining to C.N.'s termination in 2012 as part of a reduction in force), the record provides no information concerning how any adverse employment actions affected the Booz Allen work force by age or gender. Likewise, there is no information in the record concerning the overall age and gender make-up of Booz Allen's work force, broken down by job categories, or otherwise. The only related statistical evidence in the record is that as of January 20, 2011, 66.67% of the Law Department was over the age of 40 and 29.17% was over the age of 50. Def. Ex. 1 (Third Declaration of Williams Meyers).

Rather than statistics, Plaintiff relies centrally on the subjective judgments of former employees who held a variety of jobs, at a variety of times between 2007 and 2014, under a variety of managers, in different aspects of the Booz Allen organization, none of whom were affected by anything pertaining to the restructuring or any decisions made with respect to that

---

[16] The only other statistical information in the record is that 15 of the 20 Booz Allen Partners that were terminated as a result of a reduction in force (which included the termination of C.N.) were men. There is no evidence in the record concerning how this breakdown by gender related to the overall affected populations.

restructuring, including any decisions pertaining to the plaintiff.[17]  Of the seven testifying former employees, only two had a position arguably comparable to Plaintiff in the Law Department, both of which left Booz Allen more than 7 years ago.  The third witness in the LD was an administrative assistant.  The remaining witnesses were in different divisions of the company, with differing titles, supervisors, and circumstances of departure, and with limited, if any, direct knowledge of the alleged discriminatory actions at issue in this case.  None were supervised by Osborne, Meyers or Manya.  For these reasons, Plaintiff's me-too evidence is not the kind of anecdotal evidence that establishes a sufficient connection to a particular plaintiff to warrant an inference of discrimination as to that particular plaintiff.[18]  *See, e.g., Spulak v. K Mart Corp.*, 894 F.2d 1150 (10th Cir. 1990) and *Polanco v. City of Austin*, 78 F.3d 968 (5th Cir. 1996), where witnesses worked in the same positions and departments, or who could testify directly to the discriminatory behaviors of the plaintiff's supervisors.

  The record also does not contain the kind of direct evidence of discriminatory animus necessary to raise the required inferences.  Plaintiff concedes that no one ever made any

---

[17] Plaintiff contends that "[a]ll of the women who testified in this case were subject to and dealt with the same decision makers at Booz Allen who had input into the actions affecting Ms. Calobrisi's employment – namely the Booz Allen leadership team, consisting of, Ralph Shrader, the CEO and Chairman; Sam Strickland, the Chief Financial and Administrative Officer; Horatio Rozanski, Chief Personnel Officer; and C.G. Appleby, General Counsel until July 2011 (who was replaced by Robert Osborne). The leadership team met on a monthly basis." Pl.'s Supplemental Brief, Doc. No. 276 at p. 5-6.  Even were this characterization a correct statement of the record, it does not establish that the testifying women were supervised by the same supervisor or supervisors as Plaintiff or that the employment decisions that affected them were made by the same persons as Plaintiff's.

[18] One of the seven, M.F. testified that there were "multiple reports done by multiple outside organizations about why women weren't advancing to the top ranks at Booz Allen." Doc. No. 276-5, Pl.'s Ex.56 at 35:11-14. But the record does not include any of those reports or any information concerning any findings or explanations that were contained in those reports.

reference to her gender or age that she considered to be discriminatory, Pl.'s Dep. Tr. 16:8-

17:11; 26:7-19; 31:11-18;[19] and the record does not contain any statements by supervisors or

decision-makers sufficient to raise an inference of discriminatory animus directed against a class

based on age or gender.[20]  *Cf. Merrit, supra,* 601 F.3d at 301 (where the plaintiff produced

"powerful evidence showing a discriminatory attitude... toward female managers," such as

statements that "We don't have no females" and that the plaintiff was passed over in favor of a

less-experienced male because "some were uncomfortable with women having the job and were

wary of the enhanced physical requirements . . . were too demanding for women."); *see also*

---

[19] Plaintiff nevertheless contends in her summary judgment briefing that Meyers' suggestion that her departure from Booz Allen be described as a "'retirement', just as [J.H.]'s" is evidence from which discriminatory age animus can be inferred.  Based on the overall context of that statement, as reflected in the record, the Court concludes, as a matter of law, that no such inference can be drawn from that statement.

[20] Briefly summarized, the substance of this proffered direct evidence of discriminatory animus consists of the following testimony by former employees: (1) J.H. felt that she was "pushed out" of the firm because of gender based on her perception that "[e]nough woman were let go, allowed to resign, were either demoted or marginalized made me feel that I—what happened to me was not unusual."  Pl.'s Ex. 39, J.H. Dep. Tr. at 73:2-74:1.  Others were not sufficiently probative of discriminatory animus to allow a jury to infer pretext as to Plaintiff.; (2) R.S.'s "mentor" told Appleby that if he took away her job responsibilities, she would quit (which she did after Appleby reduced her work.); (3) Ralph Shrader, the CEO, said that R.S. once "spoke too aggressively to Mr. Strickland [the Chief Financial and Administrative Officer]"; (4) J.H.'s supervisor told her that she was being stripped of her duties because "several people who were working for [her] didn't like working for [her]"; (5) Appleby told D.M., his administrative assistant after 34 years in the Law Department, that at age 62, "you should be thinking about retiring"; (6) a supervisor "turned red in the face" when told there were no women in leadership roles; (7) M.F. heard Shrader say multiple times that "there are no woman qualified to be on the leadership team."; (8) Appleby told M.F. to assure Shrader that she intended to continue working when she became the primary caretaker for her children; (9) Appleby told M.F. that "You are the top woman at Booz Allen now, and that puts you in a very tricky  and difficult position."; and (10) J.H.'s direct supervisor told "bawdy jokes that were sexual in nature and derogatory toward women."

*Robinson v. Runyon, supra*, 149 F.3d. at 512 (where a fake employment application entitled

"Nigger Employment Application" that was widely circulated throughout the office, evidencing

"...a racially hostile atmosphere that was condoned by the supervisors in the [Postal Service

office] [and]...illustrates the attitudes of those supervisors.").

Ostensibly in recognition of the limitations inherent in its "me-too" evidence, Plaintiff

proposes to establish class-wide discrimination through *McDonnell-Douglas* prima facie cases of

discrimination on behalf of the testifying former employees.  Even were such proof sufficient to

establish class-wide discrimination in a non-class action case (although Plaintiff has not cited

any case that has recognized such an approach), establishing liability in such a fashion would

require in this case seven to 15 mini-trials that would involve specific determinations, first by the

Court and then by the jury, whether Booz Allen articulates a non-discriminatory reason for any

particular adverse employment action and if so whether Plaintiff then produces sufficient

evidence of pretext as to those reasons.  Such an approach would involve the Court and the jury,

in effect, adjudicating these hypothetical discrimination claims by other former employees, some

of which may turn out to be more involved factually than even Plaintiff's, and result in a

distraction and confusion for the jury, and exhaustion for all concerned, all without necessarily

dealing dispositively with the central issues embedded in Plaintiff's claims.

Overall, this case more closely resembles the situation faced in *Kozlowski v. Hampton*

*Sch. Bd.*, 77 Fed. Appx. 133 (4th Cir. 2003).  In *Kozlowski*, a high school football coach brought

an age discrimination against the School Board for accepting the principal's recommendation not

to renew his contract.  At the conclusion of trial, the jury found in favor of the School Board.  On

appeal, the Fourth Circuit affirmed the district court's exclusion of evidence regarding the

23

principal's prior acts of discrimination. The Fourth Circuit reasoned that "allowing the plaintiff

the opportunity to prove, person by person, that in each case [the principal's] purposed reasons

for non-renewal were false would have required lengthy and cumbersome mini-trials. This

process would have required, for each non-renewed individual, testimony from [the principal]

about why, five years earlier, he had refused to renew that coach's contract, rebuttal evidence

and/or testimony from the plaintiff showing that those reasons were false, and reply evidence

and/or testimony from the Board further justifying [the principal's] decision." *Id.* at 149. The

Fourth Circuit therefore concluded that there was "no error in the court's decision to exclude this

type of evidence, which would have been quite time consuming and would have distracted the

jury from the central issue in this case. . ." *Id.* Based on all of the above reasons, the Court

concludes that the proffered "pattern and practice" evidence does not, as a matter of law, rebut

Defendant's legitimate, non-discriminatory reasons for Plaintiff's demotion.[21] For the above

reasons, the Court concludes that Plaintiff has failed to adduce evidence sufficient to establish

pretext with respect to Booz Allen's non-discriminatory reasons for its treatment of Plaintiff.

*Retaliation Claim*

Plaintiff's remaining claim is that Defendant unlawfully retaliated against her by forcing

her to sign the April 5 memo and constructively discharging her after she reported her concerns

that she was being discriminated against to Chief Personnel Office Betty Thompson. "In order to

establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that she

engaged in a protected activity; (2) that her employer took an adverse employment action against

---

[21] Plaintiff concedes that were the Court to grant summary judgment in favor of the Defendant on her discrimination claims, her claim for constructive discharge would necessarily fail as well. Mar. 6, 2015 Tr. at 14:13-19.

her; and (3) that there was a causal link between the two events." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005). "To establish an adverse employment action in the context of a retaliation claim, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Nathan v. Takeda Pharm. Am., Inc.*, 890 F. Supp. 2d 629, 646 (E.D. Va. 2012) *aff'd*, 544 F. App'x 192 (4th Cir. 2013) (internal citation omitted). *See also Lettieri v. Equant, Inc., supra*, 478 F.3d at 650 (finding that the plaintiff proffered sufficient probative evidence of continuing retaliatory conduct and animus in the seven-month period between her complaint and her termination to satisfy the causation element of her prima facie case of retaliation).

Assuming, without deciding, that Plaintiff's conversation with Thompson constituted protected activity, the record is insufficient, as a matter of law, to find that she suffered any adverse employment action as a result of that conversation. Plaintiff testified that on January 26, 2011, she was informed that she was being demoted to a Senior Associate effective April 1. Pl.'s Dep. Tr. 200:7-20. Plaintiff further testified that the memo "had absolutely no new information in it . . . with the exception of the voluntary demotion." *Id.* at 279:14-17. Nevertheless, Plaintiff claims that she suffered an adverse employment action when she signed the memo because it forced her to agree that her demotion was "voluntary" when it was not. It is unclear to the Court what the term "voluntary" means within the context of the memo; but even assuming that it means, as Plaintiff seems to contend, that she had a choice whether to stay in her existing position or transfer to her new position, the Court does not find Booz Allen's insistence that she sign the memo or resign an "adverse employment action" materially beyond that imposed before

she was presented with the memo. *See Nathan, supra*, 890 F. Supp. 2d at 646. Likewise,

Plaintiff's claim that she was constructively discharged as a result of talking to Ms. Thompson

has no support in the record. The decision to demote Plaintiff was made before her conversation

with Ms. Thompson.[22]

## IV.    CONCLUSION

For the reasons discussed above, the Court finds that there are no genuine issues of

material fact and that Defendant is entitled to judgment as a matter of law.  The court therefore

GRANTS Defendant's Motion for Summary Judgment.

An appropriate Order will issue.

_____
/s/
Anthony J. Trenga
United States District Judge

March 24, 2015
Alexandria, Virginia

---

[22] The record contains very substantial evidence that Plaintiff voluntarily resigned, including undisputed evidence that after her demotion Plaintiff was asked to remain at Booz Allen and that she could have stayed on in the Senior Associate role. *See* Def. Ex. 14 (April 5 memo); Def. Ex. 21 (June 13, 2011 email from Plaintiff to D. Storms and K. Tinsky); Pl.'s Dep. Tr. 292:17-293:15 (Plaintiff testifying that Meyers asked her to stay at the company). Nevertheless, the record also contains testimony from Plaintiff that Appleby told her after her demotion that Osborne (who was critical of Plaintiff's performance based on certain legal work that she had performed) would eventually fire her; and for that reason, the Court accepts as true Plaintiff's subjective belief that she did not, as a practical matter, have the option, after her demotion, to remain at Booz Allen. This view of the facts, however, does not establish a genuine issue of material fact concerning whether she was constructively discharged in retaliation for her speaking with Thompson since all of the operative events that formed her subjective belief as to her options had already taken place as of the time she spoke with Thompson.